AJAI BHATIA *v.* MARLENE DEBEK
(SC 18000)

Norcott, Palmer, Vertefeuille, Zarella and Schaller, Js.

Argued January 7—officially released June 24, 2008

*Caroline Lewis Wolverton*, pro hac vice, with whom were *Robert A. Solomon*, and, on the brief, *Emily Teplin* and *Kristina Scurry*, certified legal interns, for the appellant (defendant).

*John R. Williams*, for the appellee (plaintiff).

*Opinion*

SCHALLER, J. In this action for malicious prosecution, the defendant, Marlene Debek, appeals from the judgment of the trial court rendered in favor of the plaintiff, Ajai Bhatia, following a trial to the court.[1] On appeal, the defendant claims that the trial court improperly: (1) failed to address her claim that, because she acted in good faith, she is immune from liability for malicious prosecution, both under the common law and pursuant to General Statutes § 17a-101e (b); (2) concluded that the plaintiff had produced sufficient evidence to establish the elements of malicious prosecution; (3) abused its discretion in denying the defendant's motion to open the judgment; and (4) awarded damages that were unsupported by the evidence and shocking to the conscience. The plaintiff responds that neither statutory nor common-law immunity applies under the facts of the present case, the trial court did not abuse its discretion in denying the plaintiff's motion to open the judgment and there was sufficient evidence in the record to support both the trial court's conclusion as to liability and its award of damages. We agree with the plaintiff and, accordingly, affirm the judgment of the trial court.

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The record reveals the following relevant facts and procedure. The plaintiff was raised in India, immigrated to the United States in 1989, and became a United States citizen in 1995. The plaintiff and the defendant met in 1990, while both were living in Fairfield, Connecticut. The defendant moved to Florida in 1991. In 1995, the plaintiff also moved to Florida, bought a house there, and he and the defendant lived together, became engaged, but never married. Their daughter, T, was born on August 22, 1996.[2] On November 21, 1996, the defendant and T moved to Connecticut without the plaintiff, who remained in Florida. The plaintiff visited T on five occasions between November, 1996, and August, 1998. In August, 2000, upon being hired by Pitney Bowes, Inc., in Shelton as a project engineer, the plaintiff moved back to Connecticut. Although the plaintiff attempted several times to visit T after his return to Connecticut, the defendant refused to allow him visitation, so the plaintiff instituted an action seeking joint legal custody of T (custody action).

In November, 2000, the court ordered supervised visitation between the plaintiff and T, and specified that the supervisor be a person of the defendant's choosing. The defendant did not allow the visitation to occur, and the antagonism between the parties mounted. During the remainder of the month of November, the plaintiff placed an anonymous call to the department of children and families (department), making various claims about the defendant, the defendant's brother, Todd Debek, and the condition of the defendant's home, including allegations of substance abuse, neglect and an unsafe home. The department conducted an investigation and determined that the claims were unsubstantiated. The defendant was aware that the plaintiff's allegations had precipitated the department's investigation of her and

---

[2] Due to the nature of the allegations in this case, we have chosen not to identify the minor child by name.

her family. In early December, 2000, based on the defendant's claims that the plaintiff had been appearing uninvited at her home and "yelling," the defendant obtained an ex parte court order prohibiting the plaintiff from contacting her except during visitation exchanges.

In January, 2001, finding that the defendant had failed to comply with the November, 2000 court order for supervised visitation, the court issued a second visitation order, and required that the visitation be supervised by Nicholas Sarno, the director of operations of the Children's Center for Supervised Visitation. After several supervised visits between the plaintiff and T, the court granted the plaintiff's motion to modify visitation, ordering unsupervised visitation with the plaintiff, including every other weekend, with pick up and drop off at the Trumbull police station.

On February 26, 2001, the first of three family relations evaluation reports was submitted to the court. The report recommended joint legal custody, with primary residence with the defendant and visitation with the plaintiff. The report also recommended that both parties seek individual therapy. The evaluator recommended therapy for the plaintiff to deal with his perception that the actions of the defendant and others were motivated by cultural bias. The evaluator's recommendation that the defendant obtain individual therapy was based on his conclusion that the defendant harbored "extreme, exaggerated fears" about the plaintiff, and that she was "consumed by anger towards the [plaintiff] and [had] gone to some length to discredit him."

The parties clashed over whether T should receive therapy. In April, 2001, without consulting the plaintiff, the defendant took T to the Yale Child Study Center for therapy. After four sessions, the therapy was terminated because the plaintiff threatened to sue the center if the

sessions continued. The defendant subsequently arranged for T to begin therapy with another service, the Child Guidance Center. The child attended therapy sessions until the plaintiff objected to the counseling and threatened legal action unless therapy stopped. During therapy, T had presented as a happy, well-adjusted child, expressing unhappiness only in connection with the "bad things" the plaintiff said about the defendant in front of T. The defendant was upset that the plaintiff was preventing T from receiving therapy.

The parties' pattern of striking out at each other through their daughter continued. In May, 2001, the plaintiff's overnight visitation was suspended because the plaintiff had reported his landlord for asserted health hazards in violation of municipal ordinances, a report that the defendant brought to the attention of the court in support of her assertion that T was in danger at the plaintiff's home. In June, 2001, the plaintiff filed a motion seeking sole custody, claiming, inter alia, that the defendant had a history of substance abuse and was sexually abusing T. Specifically, the plaintiff alleged that T had told him that the defendant had touched her inappropriately. The plaintiff later abandoned his claim that the defendant was sexually abusing T.

The defendant continued to make every effort to prevent the plaintiff from having access to their daughter. On October 30, 2001, the court conducted a hearing to resolve several motions for contempt filed by the plaintiff based on the defendant's failure to allow visitation. The court found the defendant in contempt of court for her failure to abide by the court orders, and for her stated intent during the hearing that she would continue to block unsupervised visits, despite any court orders to the contrary. The court ordered the defendant incarcerated for ninety-six hours, or until she allowed unsupervised visitation. The defendant remained incar-

cerated for the entire ninety-six hours. During that time, T was placed in the custody of the department and in foster care.

Prior to her incarceration, on October 9, 2001, the defendant had reported to the supervisor at the Child Guidance Center that T had told her that "some time ago" while she was in the plaintiff's apartment and preparing to go to a carnival, the plaintiff held her shirt and touched her vagina for a long time. The following day, the defendant contacted the department and made the same allegation.[3] The next day, October 11, 2001, the defendant repeated the allegations to the Derby police. On December 26, 2001, the plaintiff was arrested and charged with sexual assault in the first degree and risk of injury to a child. Following trial, he was acquitted of sexual assault in the first degree, but the jury was deadlocked on the risk of injury charge. After the state informed the court that T would not take the stand again in the event of a retrial, the court dismissed the risk of injury charge.

The plaintiff commenced this action for malicious prosecution in September, 2004. After a trial to the court, the court rendered judgment in favor of the plaintiff, relying not only on testimony presented before it at trial, but also on the transcripts of the criminal trial and the memorandum of decision in the custody action; *Bhatia* v. *Debek*, Superior Court, judicial district of New Haven, Docket No. FA-00-04005681-S (May 2, 2005); both of which were introduced as evidence in the present case. The court awarded the plaintiff a total of

---

[3] The department, after a thorough investigation, including interviews with the plaintiff, the defendant and two sexual abuse experts who had examined T, made a finding of substantiation of the sexual abuse based on T's "clear disclosure." Following the resolution of the criminal trial, the plaintiff appealed from the department's finding of abuse, and those findings ultimately were reversed.

$3,544,500 in damages. This appeal followed. Additional facts will be set forth as necessary.

## I

In order to lay the groundwork for our discussion of the defendant's remaining claims, we first address her claim that there was insufficient evidence to support the trial court's conclusion that the plaintiff had met his burden to establish the elements of malicious prosecution. We disagree.

We first set forth the applicable standard of review for a challenge to the sufficiency of the evidence. "[W]e must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . We also must determine whether those facts correctly found are, as a matter of law, sufficient to support the judgment. . . . [W]e give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses . . . ." (Citations omitted; internal quotation marks omitted.) *Briggs* v. *McWeeny*, 260 Conn. 296, 322, 796 A.2d 516 (2002). Keeping this standard of review in mind, we turn to the elements of the tort of malicious prosecution.

"An action for malicious prosecution against a private person requires a plaintiff to prove that: (1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." *McHale* v. *W.B.S. Corp.*, 187 Conn. 444, 447, 446 A.2d 815 (1982). "The law governing malicious prosecution seeks to accommodate two competing and ultimately

irreconcilable interests. It acknowledges that a person wrongly charged with criminal conduct has an important stake in his bodily freedom and his reputation, but that the community as a whole has an even more important stake in encouraging private citizens to assist public officers in the enforcement of the criminal law." Id., 447–48. We consider each of the four elements of malicious prosecution in turn to determine whether the trial court's conclusion was clearly erroneous.

The first element, the requirement that the plaintiff establish that the defendant initiated or procured the institution of criminal proceedings against him, is the only element that distinguishes the tort of malicious prosecution from the tort of vexatious litigation. We have stated that the elements of malicious prosecution and common-law vexatious litigation essentially are identical. See, e.g., *Rioux* v. *Barry*, 283 Conn. 338, 340 n.3, 927 A.2d 304 (2007); *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 94, 912 A.2d 1019 (2007); *Vandersluis* v. *Weil*, 176 Conn. 353, 356, 407 A.2d 982 (1978). Although the required showing for both torts essentially is the same, there is a slight difference in that a plaintiff in a malicious prosecution action must show initiation of the proceedings by the defendant. In our cases discussing vexatious litigation claims, we have overlooked this difference because, ordinarily, it is not significant for purposes of considering a claim for vexatious litigation. The difference is evident only in our precedent addressing malicious prosecution claims. Compare *Vandersluis* v. *Weil*, supra, 356 (characterizing vexatious litigation and malicious prosecution as having three identical elements—want of probable cause, malice and termination of action in plaintiff's favor), with *McHale* v. *W.B.S. Corp.*, supra, 187 Conn. 447.

We have summarized the required showing for both causes of action as follows: "To establish either cause

of action, it is necessary to prove want of probable cause, malice and a termination of suit in the plaintiff's favor." *Vandersluis* v. *Weil*, supra, 176 Conn. 356. In a cause of action for malicious prosecution, the plaintiff additionally must "establish that the defendant caused the proceeding to be instituted." *Zenik* v. *O'Brien*, 137 Conn. 592, 595, 79 A.2d 769 (1951). This requirement is due to the fact that, unlike a vexatious litigation claim, in which the underlying civil action was filed either by the defendant herself, acting pro se, or by an attorney acting on behalf of the defendant, in a malicious prosecution action, a public official, acting on behalf of the state, institutes the criminal action against the malicious prosecution plaintiff. It is, therefore, more problematic in a malicious prosecution action, as opposed to an action for vexatious litigation, for the plaintiff to connect the defendant with the actual institution of the underlying action. In accordance with the indirect connection between the underlying action and the defendant in a malicious prosecution action, we have specified the initiation of the underlying action as a separate element in malicious prosecution cases, as opposed to vexatious litigation cases, in which the plaintiff is not required to establish that the defendant initiated the underlying action. Compare *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 281 Conn. 94, with *Mulligan* v. *Rioux*, 229 Conn. 716, 731–32 n.19, 643 A.2d 1226 (1994), on appeal after remand, 38 Conn. App. 546, 662 A.2d 153 (1995).

Another reason that malicious prosecution, but not vexatious litigation, requires the showing that "the defendant initiated or procured the institution of criminal proceedings against the plaintiff"; *McHale* v. *W.B.S. Corp.*, supra, 187 Conn. 447; is because the first element of the tort allows for a limited immunity to a private citizen accused of malicious prosecution. Id., 448. The purpose of this immunity is to further "[t]he policy of

encouraging private citizens to assist in law enforce-
ment . . . . A private person can be said to have initi-
ated a criminal proceeding if he has insisted that the
plaintiff should be prosecuted, that is, if he has brought
pressure of any kind to bear upon the public officer's
decision to commence the prosecution. . . . But a pri-
vate person has not initiated a criminal proceeding if
he has undertaken no more than to provide potentially
incriminating information to a public officer. In such a
case, *if the defendant has made a full and truthful
disclosure* and has left the decision to prosecute
entirely in the hands of the public officer, he cannot
be held liable for malicious prosecution." (Citations
omitted; emphasis added.) Id. This limited immunity
attempts to strike a careful balance between the need to
encourage private citizens to assist in law enforcement
with the need to protect individuals against false and
malicious accusations. This careful balancing, not nec-
essary for the tort of vexatious litigation, reflects a
significant difference between the nature of the underly-
ing actions in the two torts.

Turning to the nature of the initiation element, we
emphasize that a defendant is entitled to the limited
immunity provided by this element only "if the defen-
dant has made a full and truthful disclosure . . . ." Id.
We explained the effect of this condition precedent in
*McHale*: "[A] private person cannot escape liability if
he knowingly presents information that is false . . . ."
Id., 449. In other words, a private citizen who knowingly
provides false information to a public officer is not
entitled to the limited immunity provided under the
initiation element, even if that person brought no pres-
sure to bear on the public officer and left the decision
to prosecute entirely in the hands of that public officer.
Not extending immunity from liability to such persons
is consistent with the public policy underlying the
immunity, to encourage private citizens to *assist* in law

enforcement, a policy that is not furthered by immunizing from liability persons who knowingly provide false information.

Although the trial court made no express finding that the plaintiff had established the element of initiation, there is ample support in the record to support a finding that, during the course of the underlying criminal action, the defendant knowingly presented information she knew to be false. The trial court cited to some of this evidence in support of its express finding that the defendant had acted with malice. For example, the trial court cited to the finding of the trial court in the custody action (custody court) that the defendant's claims that T told her that the plaintiff had sexually abused her were not credible. The court further relied on the fact that the defendant waited two days after T allegedly told her about the inappropriate touching before she reported the abuse. That delay, contrasted with the defendant's swift consultation with a pediatrician the day after T's first unsupervised visitation with the plaintiff—because, she claimed, T was experiencing vaginal discomfort—persuaded the court that the defendant was not telling the truth about the incident that gave rise to the allegations of sexual abuse. Additionally, the court relied on the fact that, in therapy sessions, T was asymptomatic during the time that the abuse allegedly occurred. The court also relied on T's testimony on cross-examination during the plaintiff's criminal trial that, prior to trial, she had practiced her testimony with the defendant, who rewarded her for "doing well . . . ." All of these facts relied on by the trial court to support its finding of malice provide sufficient support for a finding that the defendant knowingly provided false information to public officers, thereby rendering irrelevant the question of whether the defendant "insisted" that a public officer proceed with the prosecution.

We now turn to the second element of malicious prosecution, termination of the criminal proceedings in favor of the plaintiff. *McHale* v. *W.B.S. Corp.*, supra, 187 Conn. 447. In the plaintiff's criminal trial, the jury acquitted him of the charge of sexual assault in the first degree, but was deadlocked on the charge of risk of injury to a child. The trial court subsequently dismissed the risk of injury charge, after the prosecution informed the court that T would not testify in the event of a retrial. The defendant does not dispute that the judgment of acquittal on the charge of sexual assault in the first degree constitutes favorable termination. Instead, she contends that the dismissal of the risk of injury charge following a hung jury cannot support the plaintiff's claim for malicious prosecution.

We set forth our approach to the question of favorable termination in *DeLaurentis* v. *New Haven*, 220 Conn. 225, 597 A.2d 807 (1991). We explained that "we have never required a plaintiff in a vexatious suit action[4] to prove a favorable termination either by pointing to an adjudication on the merits in his favor or by showing affirmatively that the circumstances of the termination indicated his innocence or nonliability, so long as the proceeding has terminated without consideration. . . . Instead, we have always viewed the issue of whether the prior outcome was 'favorable' to the plaintiff as relevant to the issue of probable cause." (Citations omitted.) Id., 251. We set forth two concerns that guide us in our consideration of whether the underlying proceedings terminated in the plaintiff's favor. "The first is the danger of inconsistent judgments if defendants use a vexatious suit or malicious prosecution action as a

---

[4] Although *DeLaurentis* involved an action for vexatious suit, we rely on it for our analysis of the second element of malicious prosecution because, as we explained earlier in this opinion, the only respect in which the two torts differ is in regard to the first element of a cause of action for malicious prosecution.

means of making a collateral attack on the judgment against them or as a counterattack to an ongoing proceeding. . . . The second is the unspoken distaste for rewarding a convicted felon or otherwise 'guilty' party with damages in the event that the party who instituted the proceeding did not at that time have probable cause to do so." (Citations omitted.) Id., 251–52. The question we must resolve, then, is whether the dismissal of the risk of injury charge implicates either of these concerns. The first concern, the danger of inconsistent judgments, clearly is not implicated, because the risk of injury charge was dismissed and there are no ongoing criminal proceedings for the plaintiff to attack collaterally through the present action for malicious prosecution. The second concern, the distaste for rewarding a guilty party with damages, also is not implicated, because the trial court had ample evidence to support its conclusion that the defendant lied when she reported to the department and the police that her daughter had told her that the plaintiff had sexually abused her. Under the circumstances of the present case, therefore, the fact that the jury was deadlocked on the risk of injury charge does not signify that the proceedings did not terminate in the plaintiff's favor.

The third element of malicious prosecution is lack of probable cause. *McHale* v. *W.B.S. Corp.*, supra, 187 Conn. 447. "Probable cause has been defined as the knowledge of facts sufficient to justify a reasonable [person] in the belief that he has reasonable grounds for prosecuting an action. . . . Mere conjecture or suspicion is insufficient. . . . Moreover, belief alone, no matter how sincere it may be, is not enough, since it must be based on circumstances which make it reasonable. . . . Although want of probable cause is negative in character, the burden is upon the plaintiff to prove affirmatively, by circumstances or otherwise, that the defendant had no reasonable ground for instituting the

criminal proceeding." (Citations omitted.) *Zenik* v. *O'Brien*, supra, 137 Conn. 597. "The existence of probable cause is an absolute protection against an action for malicious prosecution, and what facts, and whether particular facts, constitute probable cause is always a question of law." (Internal quotation marks omitted.) *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 281 Conn. 94.

The very same facts that support a finding that the defendant initiated the underlying criminal prosecution also support a finding that the defendant lacked probable cause to institute that action. That is, the only evidence that would support a conclusion that the defendant had probable cause to institute the action— her claims that T told her that the plaintiff had touched her inappropriately—is undermined by all of the evidence in the record that persuaded the trial court that T made no such statement, including evidence that the defendant coached T to testify, the delay in reporting the alleged abuse, and T's lack of any symptoms of abuse. Put another way, because the trial court did not find the defendant credible, and because the only evidence in support of a conclusion that she had probable cause depended on her credibility, the court was justified in concluding that the defendant lacked probable cause to bring the action.

The last element of malicious prosecution requires that "the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." *McHale* v. *W.B.S. Corp.*, supra, 187 Conn. 447. There is ample support in the record for the trial court's finding that the defendant acted with malice. The record reveals that the defendant repeatedly attempted to prevent the plaintiff from exercising his visitation rights with T, and the trial court found that the defendant's report of the alleged sexual abuse was one of many attempts to keep the plaintiff from being with T.

## II

The defendant next claims, relying on both statutory and common law, that she is immune from liability for malicious prosecution because she acted in good faith. We disagree.

The defendant claims that she is entitled to good faith immunity under our common law. We adopted the good faith standard for immunity in *McHale* v. *W.B.S. Corp.*, supra, 187 Conn. 450, and explained that "[i]n our judgment, a proper concern for private assistance to public law enforcement officers requires immunity from liability for malicious prosecution for the citizen who, in good faith, volunteers false incriminating information." We later emphasized that "the public interest of encouraging complaining witnesses to come forward must be balanced against the private interest of protecting individuals from false and malicious claims." *Rioux* v. *Barry*, supra, 283 Conn. 346. That careful balancing requires that "a complaining witness who knowingly gives false information should not be protected by immunity from liability for malicious prosecution, because false information necessarily interferes with the intelligent exercise of official discretion." Id.

We have never defined the term "good faith" in this context, but understand it to be used in its traditional sense. The Appellate Court explained this common meaning aptly in *Kendzierski* v. *Goodson*, 21 Conn. App. 424, 574 A.2d 249 (1990), and we now adopt that definition. "In common usage, the term good faith has a well defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation. [35 C.J.S., Faith 605 (1960)] and cases cited. It has been well defined as meaning [a]n honest intention to abstain from taking an unconscientious

advantage of another, even through the forms or techni-
calities of law, together with an absence of all informa-
tion or belief of facts which would render the
transaction unconscientious. . . . It is a subjective
standard of honesty of fact in the conduct or transaction
concerned, taking into account the person's state of
mind, actual knowledge and motives. . . . Whether
good faith exists is a question of fact to be determined
from all the circumstances." (Citations omitted; internal
quotation marks omitted.) *Kendzierski* v. *Goodson*,
supra, 429–30.

In claiming that she is entitled to good faith immunity,
the defendant relies on the memorandum of decision
in the custody action, the factual findings of which were
adopted by the court in the present case. The custody
court stated several times that the defendant sincerely
and truly believed that the plaintiff sexually abused T.
The defendant also points out that the custody court
signified its belief that T told the defendant that *some-
thing* transpired between the plaintiff and T that made
T feel uncomfortable. Specifically, the defendant relies
on the custody court's statement that: "It is entirely
possible that the child discussed with her mother time
spent with her father and she stated he touched her
vagina." The custody court also made a factual finding
as to what most likely had transpired between T, the
plaintiff and the defendant: "The court concludes that
of everything that it heard, the following is most likely
what occurred. On at least one occasion, [the plaintiff's]
hand was on his daughter's bottom, whether by helping
her pull up a bathing suit, tucking a shirt tail in her
pants or the like. T did not like it. She did not tell him
but told the person she feels safest with, her mother."
The custody court further concluded that the defendant
was predisposed to view this statement as a revelation
that the plaintiff had sexually abused T. Based on these
factual findings of the custody court, the defendant

argues that she had a good faith, reasonable belief that the plaintiff sexually abused T.

The defendant's reliance on these statements in the custody court's memorandum of decision fails for two reasons. First, the statements themselves must be viewed within the context of the entire decision, in which the custody court repeatedly stated that the defendant was not credible, and even went so far as to find that the defendant lied under oath when she testified that she wanted T to have a relationship with her father. As for the defendant's adamant insistence that the plaintiff committed the sexual abuse, the custody court cited to a report by Sidney Horowitz, a clinical psychologist who supervised therapeutic visitation between the plaintiff and T in 2004. Horowitz described the defendant's psychological state as including "a self belief that is pervasive such that she rejects anything that does not fit into her belief system." In other words, the defendant wanted to believe that the plaintiff sexually abused T, so she interpreted T's statement accordingly. The custody court explained that, when T made whatever statement she did regarding unwanted physical contact by the plaintiff, the defendant's "psychological prism automatically construed what T told her as sexual abuse . . . ." The trial court also pointed to several unproven and unsupported claims that the defendant had made throughout both the custody and criminal proceedings, all of which led the custody court to conclude that the sexual abuse allegations were not credible and instead were motivated by her desire to prevent the plaintiff from having contact with T. One such claim was that T wet her bed and engaged in sexualized behavior with another child, a claim at odds with the facts that during the relevant period, T's treating therapist reported none of those symptoms and the defendant did not take the child to her pediatrician for treatment of those symptoms. Additional claims

included the defendant's repeated insistence that supervised visitation with the plaintiff was necessary because the plaintiff might otherwise flee to India with T, a fear that was not supported by the evidence, and her statement to a department employee, during the department's investigation of the sexual abuse allegations, that she had not "questioned [T] or pursued [T] about the sexual abuse because she did not want to traumatize her even more," a statement contradicted by the defendant's own admission during testimony at the criminal trial that she had discussed the issue with T throughout the week after the initial revelation.

In the context of all of the statements and findings of the custody court in the custody action, the most likely meaning of the two statements relied on by the defendant is not that she acted in good faith, but that she persuaded herself that what she knew to be false was true, because the lie was consistent with her goal to prevent the plaintiff from having a relationship with T. While the end result of the defendant's self-deception was that she "profoundly believe[d]" that the plaintiff sexually abused their daughter, that purposeful self-deception in no way conforms to the traditional understanding of good faith as signifying an honesty of purpose and freedom of intention to defraud.

Second, the defendant's reliance on the findings of the custody court, as the defendant interprets those findings, cannot be reconciled with the factual findings of the trial court in the present case. Specifically, the trial court found that the defendant acted without probable cause and with malice, and that her actual "motive was to harm the plaintiff and to keep him from having any contact with their daughter." Those findings are inconsistent with a conclusion that the defendant acted in good faith. As we have explained in part I of this opinion, there was ample support in the record to support the trial court's finding of malice, a state of mind inconsistent with good faith.

For substantially the same reasons, we reject the defendant's claim that she is entitled to statutory immunity pursuant to § 17a-101e (b),[5] which provides immunity from criminal liability to persons who "in good faith" report child abuse. Although the statute does not define the term "good faith," it is not necessary to engage in a lengthy statutory interpretation to resolve the defendant's claim, because, given the trial court's well supported factual findings that the defendant acted with malice and without probable cause, the meaning of the term "good faith" does not support a conclusion that the defendant acted with good faith in reporting the alleged sexual abuse. See General Statutes § 1-1 (a) ("[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly").

---

[5] General Statutes § 17a-101e (b) provides in relevant part: "Any person . . . [who] in good faith, makes . . . the report pursuant to sections 17a-101a to 17a-101d, inclusive, and 17a-103 shall be immune from any liability, civil or criminal, which might otherwise be incurred or imposed and shall have the same immunity with respect to any judicial proceeding which results from such report provided such person did not perpetrate or cause such abuse or neglect."

Section 17a-101e (b) applies to persons such as the defendant by virtue of General Statutes § 17a-103, which provides in relevant part: "(a) Any mandated reporter acting outside his professional capacity and *any other person* having reasonable cause to suspect or believe that any child under the age of eighteen . . . has been abused or neglected, as defined in section 46b-120, may cause a written or oral report to be made to the Commissioner of Children and Families or his representative or a law enforcement agency. The Commissioner of Children and Families or his representative shall use his best efforts to obtain the name and address of a person who causes a report to be made pursuant to this section. In the case of an oral report, such report shall be recorded on tape and the commissioner or his representative shall announce to the person making such report that such report is being recorded and shall state the penalty for knowingly making a false report of child abuse or neglect under subsection (c) of section 17a-101e. . . ." (Emphasis added.)

### III

We next address the defendant's claim that the trial court abused its discretion in denying the defendant's motion to open the judgment. She claims that the court should have granted the motion because new evidence presented by the defendant in support of the motion constituted good and compelling reason for granting the motion. We disagree.

We begin with the standard of review for the denial of a motion to open. "The principles that govern motions to open or set aside a civil judgment are well established. A motion to open . . . a judgment . . . is addressed to the [trial] court's discretion, and the action of the trial court will not be disturbed on appeal unless it acted unreasonably and in clear abuse of its discretion. . . . In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action. . . . The manner in which [this] discretion is exercised will not be disturbed so long as the court could reasonably conclude as it did." (Internal quotation marks omitted.) *Reiner, Reiner & Bendett, P.C.* v. *Cadle Co.*, 278 Conn. 92, 107, 897 A.2d 58 (2006).

In her motion to open, the defendant cited to a June 15, 2006 hearing held by the Juvenile Court, the reports by the department and the minor child's attorney that prompted the hearing and certain subsequent orders entered by the Juvenile Court as new evidence that constituted good and compelling reason for the court to grant her motion. Because the defendant's motion to open was filed under seal, we do not set forth the specific facts alleged therein. Following our in camera review of the motion, however, we note that the defendant's motion relied on evidence that is consistent with the findings arrived at and relied on by the trial court in reaching its verdict, and that evidence, therefore,

would have been unlikely to affect the verdict. Accordingly, the court was within its discretion in declining to open the judgment. *Steve Viglione Sheet Metal Co.* v. *Sakonchick*, 190 Conn. 707, 712, 462 A.2d 1037 (1983) ("[a] motion to open in order to permit a party to present further evidence need not be granted where the evidence offered is not likely to affect the verdict").

## IV

Finally, we address the defendant's claim that the trial court's damages award was unsupported by the evidence.[6] We disagree.

The court awarded the plaintiff a total of $3,544,500 in damages, including $3,134,500 in compensatory damages and $410,000 in punitive damages. The compensatory damages awarded consisted of $500,000 for loss of income and diminution of future income due to the defendant's conduct, $130,000 for attorney's fees incurred to defend the criminal prosecution, $4500 for the plaintiff's bail bond premium and $2.5 million for emotional distress, loss of reputation and humiliation. The punitive damages consisted of $410,000 in attorney's fees incurred by the plaintiff for the present case. Because the standards of review for compensatory and punitive damages differ, we discuss the two categories separately.

In reviewing a trial court's award of compensatory damages, we have stated that "[t]he trial court has broad

---

[6] The defendant also claims that the damages award is so excessive as to shock the conscience. The "shock the conscience" standard is one that is applicable in the context of a jury award of damages, not an award by the trial judge. See, e.g., *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 450, 815 A.2d 119 (2003) (reviewing trial court's denial of motion to set aside jury's verdict as excessive, noting that test is "whether the verdict so shocks the sense of justice as to compel the conclusion that the *jury* [was] influenced by partiality, mistake or corruption" [emphasis added; internal quotation marks omitted]); *Buckman* v. *People Express, Inc.*, 205 Conn. 166, 175, 530 A.2d 596 (1987) (same).

discretion in determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous." (Citations omitted; internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 68, 717 A.2d 724 (1998). "To authorize a recovery of more than nominal damages, facts must exist and be shown by the evidence which affords a reasonable basis for measuring the [plaintiff's] loss. . . . The [plaintiff has] the burden of proving the nature and extent of the loss . . . ." (Citation omitted.) *Johnson* v. *Flammia*, 169 Conn. 491, 501, 363 A.2d 1048 (1975). "Mathematical exactitude in the proof of damages is often impossible, but the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate." (Internal quotation marks omitted.) *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 59, 717 A.2d 77 (1998).

We conclude that there is sufficient evidence in the record to support the trial court's award of compensatory damages. The plaintiff testified at trial that he paid the $4500 for the bail bond premium, and that his total bill for attorney's fees for his criminal defense amounted to at least $130,000. The trial court was entitled to credit that testimony. As for the award for loss of income and diminution of future income, the court based its award on evidence that established that, prior to the criminal prosecution, the plaintiff had earned $100,000 a year working at Pitney Bowes, Inc. He was terminated from his employment following his arrest, and thereafter had difficulty obtaining and keeping any employment other than menial jobs.[7]

[7] The defendant claims that the trial court improperly precluded testimony relevant to the award for lost income and diminished earning capacity. Specifically, the defendant argues that the court improperly sustained the plaintiff's objections to her attempts to introduce evidence of the plaintiff's alleged history of repeated termination from employment, which would have undermined the plaintiff's claim for lost income and diminished earning

The defendant claims that the award of $2.5 million is unreasonable. We acknowledge that it is an uncommonly large award. We are mindful, however, that, although it is difficult to measure emotional distress in terms of money, "[a]n award of damages for pain and suffering is peculiarly within the province of the trier of fact . . . ." *Vajda* v. *Tusla*, 214 Conn. 523, 533, 572 A.2d 998 (1990). The court, in explaining the liberal award, emphasized the "staggering" nature of the plaintiff's emotional distress, loss of reputation and humiliation, stating: "It is difficult to imagine anything worse than being falsely accused of sexually assaulting your own child and having the accuser brainwash the child into believing the false allegations." With this background, we cannot say that the trial court's award was clearly erroneous.

In awarding punitive damages in the form of attorney's fees, "[t]he trial court has broad discretion in determining whether damages are appropriate. . . . Its decision will not be disturbed on appeal absent a clear abuse of discretion." (Internal quotation marks omitted.) *Lydall, Inc.* v. *Ruschmeyer*, 282 Conn. 209, 245, 919 A.2d 421 (2007). "Punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights." *Vandersluis* v. *Weil*, supra, 176 Conn. 358. Under this standard of review, the trial court's decision to award punitive damages was not an abuse of discretion. There is sufficient evidence in the record to support the conclusion that the defendant acted with reckless indifference to the rights of the plaintiff. The court calculated the damages pursuant to General Statutes § 52-251c (a), which sets forth limits for contin-

capacity. The record reflects that the trial court granted the plaintiff's objections to her questions on the ground that the questions were irrelevant.

gency fees in personal injury actions.[8] The calculation of the attorney's fees presumably was based on the fee agreement between the plaintiff and his counsel, a point the defendant does not contest.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[8] General Statutes § 52-251c (a) provides: "In any claim or civil action to recover damages resulting from personal injury, wrongful death or damage to property occurring on or after October 1, 1987, the attorney and the claimant may provide by contract, which contract shall comply with all applicable provisions of the rules of professional conduct governing attorneys adopted by the judges of the Superior Court, that the fee for the attorney shall be paid contingent upon, and as a percentage of: (1) Damages awarded and received by the claimant; or (2) the settlement amount received pursuant to a settlement agreement."