******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JANET WAGNER ET AL. *v.* OUR LADY OF
MOUNT CARITAS, O.S.B., INC.
(AC 36373)

Beach, Sheldon and Dupont, Js.

Argued January 22—officially released June 16, 2015

(Appeal from Superior Court, judicial district of New Britain, Swienton, J.)

*Edward Muska*, for the appellant (defendant).

*Jeremy S. Donnelly*, for the appellees (plaintiffs).

*Opinion*

SHELDON, J. The defendant, Our Lady of Mount Caritas, O.S.B., Inc., appeals from the judgment of the trial court denying its motion to set aside the jury verdict in favor of the plaintiffs, Janet Wagner and her husband, Jess Wagner, on their claim for punitive damages.[1] The defendant claims that the jury's verdict that the plaintiffs were entitled to punitive damages should have been set aside because the jury's determination that it had fraudulently misrepresented to the plaintiffs that it was a Roman Catholic Benedictine monastery was not supported by the evidence adduced at trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On November 1, 1979, Bishop Daniel P. Reilly, of the Roman Catholic Diocese of Norwich (diocese), issued a "Decree of Establishment of the Community of Mount Caritas as a Pious Union." Pursuant to that decree, the union consisted of "Sister Mary Peter [also known as Dorothy Jordan],[2] professed Sister of the Benedictine Community in Stillwater, Massachusetts and one secular Oblate, Eleanor J. Tremko, by name."[3] The stated reason for the establishment of the union was to promote contemplative life and to "strength[en] . . . family life and enable individuals and families to embrace the Spirit of Christ . . . ." Sister Mary Peter was named as "temporary Superior of this Union until such time as, with God's blessings, the community may approach canonical approval for a Constitution to become a Religious Community." The decree further provided: "This decree is effective for an experimental period of two years in which time the working order of the Spirit may show forth the principle of attraction to draw others to this apostolate and way of life. At the end of this period, if there is a witness of growth to six or more members, we shall then consider canonical erection or more permanent union."

On October 26, 1982, Bishop Reilly issued another "Decree of Establishment of the Community of Mount Caritas as a Pious Union," which noted the identical purpose and goal of the union as set forth in the 1979 decree, and further provided: "This decree is effective until such time as the working of the Spirit may show a witness of growth to six or more members. We shall then consider canonical erection or more permanent union."

Since that time, the defendant has held itself out as a Benedictine monastery, a Roman Catholic institution. It has consistently operated under the name of "Our Lady of Mount Caritas Monastery, O.S.B." That name is used on the sign at the entrance of the defendant's property in Ashford, on their website, on various literature distributed by the defendant, and at various events within the surrounding community at which the defen-

dant solicited donations from members of the public. Testimony at trial revealed that "O.S.B." is readily known to practicing Catholics as an indication that the defendant is of the Order of Saint Benedict, a Roman Catholic religious order. The defendant frequently has held itself out as being located "within the diocese of Norwich." The women who reside on the defendant's property wear Roman Catholic Benedictine habits, engage in Roman Catholic ceremonies and observe Roman Catholic customs.

Over the years that followed the defendant's establishment in 1979, its relationship with the diocese deteriorated. Bishop Reilly was transferred to another diocese in 1995, at which time he instructed Jordan to meet with his successor, Bishop Daniel Hart, to review and get "permission for all of the permissions" that he had given the defendant and renew them. When Jordan, who is also the defendant's president, met with Bishop Hart, he expressed his disapproval of the defendant. Bishop Hart wrote to Jordan on June 4, 1999, informing her that the defendant was, at most, a "private association of the faithful," and so directed her to "correct any misconceptions regarding [its] status which may have been inadvertently conveyed to others."

On May 13, 2004, Bishop Michael R. Cote, Bishop Hart's successor, wrote to Jordan, noting the earlier restrictions placed upon the defendant by Bishops Hart and Reilly, and renewing those restrictions as follows: "You are not to reserve the Blessed Sacrament or to have celebrations of the Eucharist at Mount Caritas. You are not to do fundraising or appeal for vocations in the Diocese of Norwich. I am checking to make sure that Monsignor Brown has made all arrangements necessary for your listing to be removed from the Kenedy and Connecticut Catholic Directories. Any other restrictions placed by my predecessors are to be considered by you to have been continued by me. Additionally, I am informing you that the decree by which an attempt was made to form a pious union of two persons was and is canonically invalid." In her testimony at trial, Jordan acknowledged that the diocese had told her not to refer to the defendant as a monastery, not to call it "O.S.B.," and not to identify the defendant as Benedictine. Despite the diocese's admonitions, Jordan admitted that she continued to do all of those things without diocesan approval.

In August, 2008, the plaintiff, who had become an oblate in 1996 in association with a Benedictine monastery in Nebraska, began looking for a monastery closer to her home in Connecticut. She found the defendant's website on the Internet and, based upon its content, believed the defendant to be a Roman Catholic institution. Specifically, the plaintiff noted that "Our Lady of Mount Caritas is Latin . . . [that] Caritas is charity or really love . . . [and that Latin is] the official language

of the Roman Catholic Church." She also noted defendant's use of the title "O.S.B., Order of Saint Benedict, which is very distinctly and absolutely Roman Catholic, Order of Saint Benedict." The website also referred to the "Diocese of Norwich"; contained hyperlinks to webpages "about the life of St. Benedict"; referred to Jordan as "Reverend Mother Mary Peter . . . a title for religious superiors"; and used, as its motto, the Latin phrase "ora et labora," meaning pray and work. The website portrayed the defendant's residents wearing the traditional Benedictine habit, and spoke of "chanting the divine office." The plaintiff clicked on a link on the defendant's website and donated $50 "for the chapel." In response, she received a thank you note for her donation from Jordan, in which Jordan suggested that she visit the defendant's property in Ashford if she was ever in the area. The plaintiff called the defendant and scheduled a visit.

On August 24, 2008, the plaintiff visited the defendant. Upon entering the defendant's property, she saw: "[A]n enormous beautiful gold leaf engraved sign saying Our Lady of Mount Caritas with the Benedictine pax, which is a motto, another motto. It says monastery rule and spirit of St. Benedict. . . . [Y]ou go to the top of the hill . . . [where] there was a . . . life-size . . . cross . . . . [A]nd then over to the right there was a building with a statue of white alabaster marble . . . of the Blessed Virgin Mary . . . ." She and Jordan exchanged a traditional Benedictine greeting in Latin and visited briefly.

After her initial visit to the defendant in August, 2008, the plaintiff quickly became involved in all of its activities in Ashford. She participated in bible study groups and various fundraising events, mostly with the goal of raising the money to build the new chapel. She developed a close relationship with women she believed to be Roman Catholic nuns who were involved with the defendant, including Jordan, whom she respected. On August 23, 2009, because she had been spending so much time with and contributing financially to the defendant, the plaintiff transferred her oblation from the monastery in Nebraska to the defendant.

The plaintiff and Jordan discussed the defendant's "issues" with the diocese on the day they first met in August, 2008. Jordan then told the plaintiff that there was tension between the defendant and the diocese, which the plaintiff construed to be the typical tension between the diocese wanting the defendant "to be more updated" and Jordan "want[ing] it the old way, monastic traditional." The plaintiff also surmised that the tension between Jordan and the diocese stemmed from Jordan's willingness to stand up to the "male hierarchy" of the Roman Catholic Church, a trait that the plaintiff respected. Jordan addressed the issues with the diocese again when the plaintiff was considering transferring

her oblation. Jordan showed the plaintiff the pious union decree and explained that although Bishop Reilly had viewed the defendant favorably, Bishop Hart and Sister Sally J. Tolles, a canon and civil lawyer employed by the diocese, did not. Jordan told the plaintiff that the tension with the diocese originated from an incident at a bake sale at which Jordan allegedly slapped a sister across the face. Jordan did not inform the plaintiff of any disagreements with the diocese regarding the defendant's formation or official status as a Roman Catholic institution.

As the plaintiff spent more time in Ashford, she and her husband discussed moving closer to the defendant. Indeed, at some point in early 2009, the plaintiff suggested to Jordan that she and her husband use the money with which they had intended to purchase a home closer to the defendant to fund the construction of the chapel, which would include a small space on the second floor in which the plaintiff and her husband would be permitted to reside, rent free, for the remainder of their lives. After several discussions, Jordan agreed to the plaintiff's suggestion. When, however, the plaintiff's attorney drew up an agreement to effect the agreement between the plaintiffs and the defendant, Jordan told the plaintiff that she was "insulted" and stated, "This isn't how we do things. . . . [T]his is not the way it's done in religious communities." Jordan refused to sign the agreement. She told the plaintiff, "[Y]ou have to have faith." The plaintiff took Jordan at her word, explaining that she did so "[b]ecause [Jordan is] a [C]atholic nun, she's in vows; she has to answer to Christ." She thus proceeded with the funding and construction of the chapel without a signed agreement. The plaintiffs acquired the necessary funds for construction by taking out a home equity loan in the amount of $200,000 on their previously unencumbered home in Newington. Thereafter, as the defendant incurred bills for the chapel's construction, funds were taken from the plaintiffs' line of credit and put in a separate account of the defendant's, which was called "the chapel fund." The plaintiff and Jordan were the signatories on that fund.

On February 17, 2011, Bishop Cote sent a letter to the plaintiff advising her, among other things: that the defendant was not, and never had been, a Benedictine monastery; that the residents at Mount Caritas were not Benedictine sisters; that the defendant did not have permission from the diocese to build a Roman Catholic chapel; and that the defendant did not have permission to solicit money or to sell items in any Roman Catholic parish in the diocese. The plaintiff testified that this was the first time that she had heard anything disputing the defendant's status as a monastic community. Upon receipt of the bishop's letter, the plaintiff was in disbelief. Based on the pious union decree that Jordan had shown her, along with Jordan's prior representations,

the plaintiff believed that the defendant had been a monastery for thirty-five years. When the plaintiff asked Jordan about the content of the letter, Jordan informed her that she had received a similar letter from the bishop. Jordan told the plaintiff that she was upset by the content of the letters, and explained that the letter was a continuation of the persecution of the defendant that had been started by Bishop Hart and Sister Sally. Jordan portrayed herself to the plaintiff as a victim and told the plaintiff that the statements in the letter were lies. Jordan told the plaintiff that "the bishop does not know what he's talking about because we already have a chapel. We're not constructing a new chapel. We're enlarging the facility that we have already, which was tiny. Bishop Cote, the signatory, never went to Mount Caritas, and they've been trying to suppress Mount Caritas for a number of years, but they can't do it because of the pious union agreement that Bishop Reilly signed." The plaintiff initially accepted Jordan's representations that the bishop was lying, and believed that the situation was simply a manifestation of the manner in which the Roman Catholic Church treats women. Jordan convinced the plaintiff that the diocese was seeking to acquire the defendant's real estate. Although the plaintiff tried to maintain her faith in Jordan and the defendant, the plaintiff testified that, at that point, she "stopped trusting" Jordan. Consequently, the plaintiff asked her lawyer to draft another agreement regarding the construction of the chapel and a residence for the plaintiffs. After making some amendments, Jordan signed the agreement.

The plaintiff thereafter wrote a letter to Bishop Cote in response to his February 17, 2011 letter, to which the bishop did not respond. The plaintiff initially construed the bishop's failure to respond to her letter as confirmation of her faith in Jordan and cemented her belief of Jordan's representation that the diocese was simply out to get her. Although the defendant did not have the support of the diocese, the plaintiff still believed that the defendant was a Roman Catholic monastery.

While the construction of the chapel continued over the course of 2011, the plaintiff's relationship with Jordan deteriorated. The plaintiff testified that Jordan "complained about everything that I did and everything that I did was not enough." On October 12, 2011, the plaintiff and Jordan had an argument that ultimately resulted, according to the plaintiff's testimony, in Jordan ordering the plaintiff to leave the defendant's property. The plaintiff's involvement with the defendant was thus severed, and she has returned only to retrieve her personal belongings.

The plaintiffs brought this action against the defendant by way of a seven count complaint alleging breach of contract, breach of the covenant of good faith and

fair dealing, promissory estoppel, fraud in the inducement to enter into the contract, fraudulent misrepresentation, negligent misrepresentation, and statutory theft pursuant to General Statutes § 52-564. The crux of the plaintiffs' complaint was premised on the allegation that the defendant fraudulently misrepresented that it was a Roman Catholic Benedictine monastery, and, in reliance on its misrepresentations, the plaintiffs agreed to donate the funds to build a structure that would house a chapel and a small living area in which they would be permitted to reside, rent free, for the remainder of their lives. The defendant filed an answer essentially denying the plaintiffs' allegations of wrongdoing or leaving them to their proof, and filed two special defenses. The first special defense, which applied to the first, second, and third counts of the plaintiffs' complaint, alleged that, on October 12, 2011, the plaintiff had told Jordan that she no longer wished to be involved with the defendant or to live on the defendant's property, and that, by so doing, she materially breached the contract between the parties, thereby excusing the defendant from further performance under the contract. The second special defense, which applied to the fourth, fifth, and sixth counts of the plaintiffs' complaint, alleged that the plaintiff was aware of the defendant's relationship with the diocese prior to and throughout the construction of the chapel, and thus that she was not misled or deceived by the defendant in any way.

Following a jury trial, the jury returned a verdict in favor of the plaintiffs on their claims of breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, fraudulent misrepresentation, and negligent misrepresentation.[4] The jury found in favor of the defendant on the plaintiffs' statutory theft claim. The jury also determined that the plaintiffs were entitled to punitive damages.[5] The jury awarded the plaintiffs compensatory damages in the amount of $207,301.18.[6]

Thereafter, the defendant filed a motion to set aside the verdict as to the fraudulent misrepresentation and negligent misrepresentation claims on the basis that the verdict on those claims was contrary to the evidence.[7] The defendant also sought to set aside the verdict entitling the plaintiffs to punitive damages on the ground that there was no evidence that its conduct was outrageous or done with reckless disregard to the rights of the plaintiffs. The plaintiff filed a motion for punitive damages seeking $105,073.78 in attorney's fees and $2846.37 in nontaxable costs and expenses. By way of a memorandum of decision filed on December 4, 2013, the court denied in part the defendant's motion to set aside the verdict.[8] The court reasoned: "The court instructed the jury that in order to find in favor of the plaintiffs on the claim of fraudulent misrepresentation the plaintiff would have to prove, by clear and convinc-

ing evidence, that the defendant made a false statement of fact—that is, it was a part of the Benedictine Order of the Catholic Church—that the statement was untrue and known to be untrue by the defendant or that the defendant made the statement with reckless disregard for the truth of the matter, and that the defendant made the false statement in order to induce the plaintiffs to act upon it. Finally, the plaintiffs would have to prove by a fair preponderance of the evidence that the plaintiffs did act on the statement to their injury.

"The court, having heard the same evidence that was heard by the jury, cannot accept the assertion that the jury could not have found, by clear and convincing evidence, that the defendant made the false misrepresentations, or that the plaintiffs relied on said misrepresentations in making the contributions to the defendant. The jury could have reasonably credited the testimony of the plaintiffs as to their version of the events rather than the version submitted by the defendant, and found that misrepresentations were made either recklessly or intentionally, or that the defendant knew or should have known the truth of the misrepresentation. The court finds that the jury could reasonably, logically and legally have reached its conclusion from the evidence viewed most favorably to the plaintiffs.

"The court further instructed the jury that the plaintiffs were seeking an award of punitive damages, which would be awarded if [the jury] found from the facts established that the defendant's conduct was with reckless indifference to the rights of the plaintiffs, and was in fact outrageous. Again, in viewing the evidence most favorably to the plaintiffs, the jury could have reasonably and logically reached the conclusion that the conduct of the defendant was done with reckless indifference to the rights of the plaintiffs, or that the conduct was outrageous." The court awarded the plaintiffs punitive damages in the amount of $71,255.76, reflecting $68,409.39 in attorney's fees and $2846.37 in nontaxable costs and expenses. This appeal followed.

On appeal, the defendant is challenging only the trial court's denial of its motion to set aside the jury's verdict determining that the plaintiffs were entitled to punitive damages.[9] "The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence. . . . [The court] should not set aside a verdict [if] it is apparent that there was some evidence upon which the jury might reasonably reach [its] conclusion, and should not refuse to set it aside [if] the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles . . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb." (Internal quotation marks omitted.) *Edmands*

v. *CUNO, Inc.*, 277 Conn. 425, 452–53, 892 A.2d 938 (2006).

"[I]n order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights." (Internal quotation marks omitted.) *Berry* v. *Loiseau*, 223 Conn. 786, 811, 614 A.2d 414 (1992). "In awarding punitive damages . . . [t]he trial court has broad discretion in determining whether damages are appropriate. . . . Its decision will not be disturbed on appeal absent a clear abuse of discretion. . . . Punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights." (Citation omitted; internal quotation marks omitted.) *Bhatia* v. *Debek*, 287 Conn. 397, 420, 948 A.2d 1009 (2008). "Recklessness is a state of consciousness with reference to the consequences of one's acts. . . . It is more than negligence, more than gross negligence. . . . The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . Wanton misconduct is reckless misconduct. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action. . . . Whether the defendant acted recklessly is a question of fact subject to the clearly erroneous standard of review." (Citation omitted; internal quotation marks omitted.) *Avery* v. *Medina*, 151 Conn. App. 433, 450, 94 A.3d 1241 (2014).

In arguing that the trial court should have set aside the jury's verdict finding that the plaintiffs are entitled to punitive damages, the defendant challenges the jury's determination that it fraudulently misrepresented[10] to the plaintiff its "affiliation with the Catholic Church and the Benedictine Order to induce the plaintiffs into entering into the agreement," which, the plaintiffs concede, is the only claim advanced by them upon which the punitive damages award could have been based.

To establish a case of fraud, a party must prove by clear and convincing evidence that "(1) . . . a false representation of fact was made; (2) . . . the party making the representation knew it to be false; (3) . . . the representation was made to induce action by the other party; and (4) . . . the other party did so act to her detriment." (Emphasis omitted; internal quotation marks omitted.) *Warner* v. *Brochendorff*, 136 Conn. App. 24, 33 n.9, 43 A.3d 785, cert. denied, 306 Conn. 902, 52 A.3d 728 (2012).

The record in this case is replete with evidence of the defendant's portrayal of itself as a Roman Catholic Benedictine monastery. The record is likewise laden with evidence that Jordan knew that the defendant was

not, in fact, a Roman Catholic Benedictine monastery. The plaintiffs testified that they would not have given money to the defendant if they had known that it was not a Roman Catholic institution. Although Jordan apprised the plaintiff of the contentious relationship between the defendant and the diocese, and the plaintiff later was informed by the diocese that the defendant was not a Roman Catholic Benedictine monastery, Jordan repeatedly assured the plaintiff that the diocese was lying. The plaintiff continued to trust Jordan and thus continued to fund the construction of the chapel. To be sure, Jordan's testimony at trial conveyed a different story than that presented by the plaintiff. "It is fundamental [however] that issues relating to credibility and the assessment of conflicting evidence are within the province of the jury." *State* v. *Washington*, 155 Conn. App. 582, 590, 110 A.3d 493 (2015). The jury was free to credit the testimony of, and the evidence presented by, the plaintiffs over that adduced by the defendant. The jury reasonably could have concluded that the defendant repeatedly and intentionally, over a period of years, misrepresented itself to the plaintiff as a Roman Catholic Benedictine monastery, knowing that that was the type of community that she was searching for in which to continue her work as an oblate. The evidence amply supported a finding that the defendant intentionally misrepresented its status to induce the plaintiffs to fund the construction of the chapel, and that, in so doing, it displayed a reckless indifference to the rights of the plaintiffs. We therefore conclude that the court did not abuse its discretion in denying the defendant's motion to set aside the verdict with respect to the plaintiffs' entitlement to punitive damages.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Because this case arises primarily from Janet Wagner's dealings with the defendant, any reference to the plaintiff in the singular is to her.

[2] Jordan is also the president of the defendant.

[3] Sister Sally J. Tolles, a canon and civil lawyer employed by the diocese, testified at trial that oblates are "laypeople who associate themselves with monasteries or abbeys or priories in order to say that they will help in a spiritual way or in a financial way with the needs of the community . . . ."

[4] The parties agreed to the withdrawal of the fraud in the inducement count prior to the court's charge to the jury.

[5] The jury was instructed, without exception, that it would determine whether an award of punitive damages was appropriate, and, if so, the court would determine the amount of such an award, based upon attorney's fees and nontaxable costs.

[6] In awarding damages, the jury did not specify the grounds for its award; in other words, the damage award was not broken down into components for each of the plaintiffs' claims.

[7] The parties agreed that the verdict on promissory estoppel should be set aside.

[8] The court granted the motion to set aside the verdict as to the promissory estoppel claim. See footnote 7 of this opinion.

[9] The defendant is not challenging the amount of the punitive damages awarded by the court; nor is the defendant challenging the jury's award of compensatory damages.

[10] The defendant also challenges the jury's determination on the plaintiffs' negligent misrepresentation claim as a basis for its punitive damages award. Because negligent conduct cannot provide a basis for such an award, we

need not address that argument. See *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 444, 815 A.2d 119 (2003).

—————————————————————