QUINTIN BRUMBAUGH, APPELLEE, v. THE FRONTIER
REFINING COMPANY, A CORPORATION, APPELLANT.
113 N. W. 2d 497

Filed February 23, 1962.  No. 35114.

*Heaton & Heaton,* for appellant.

*Harry S. Grimminger,* for appellee.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

This is an action at law brought by Quintin Brumbaugh, plaintiff, in the district court for Hall County, against The Frontier Refining Company, a corporation, defendant, to recover damages for malicious prosecution.

The case was tried to a jury, resulting in a verdict for the plaintiff in the amount of $5,000. The defendant filed a motion for judgment notwithstanding the verdict or in the alternative for a new trial, which was overruled. Defendant perfected appeal to this court.

We will refer to Quintin Brumbaugh as plaintiff, and to The Frontier Refining Company as defendant.

The defendant is a corporation organized under the laws of the State of Wyoming, engaged in business in the State of Nebraska, and qualified to do business in this state.

The record discloses that on April 16, 1958, the plaintiff accepted and approved a contract with the defendant to operate a filling station in Grand Island. The contract provided in part that all merchandise supplied by the defendant would be retained by it until sold by the plaintiff; that the plaintiff would be responsible for all inventories of petroleum products and other merchandise supplied to the plaintiff by the defendant; that the plaintiff would remit to the defendant at Denver, Colorado, or the bank defendant designated, all sums collected by the plaintiff for merchandise sold; and that the plaintiff would prepare and submit to the defendant operating reports as directed by the defendant. The contract set forth the commissions to be received by the plaintiff for the sale of certain specified items of merchandise. H. E. Armitage, vice president of the defendant, signed the contract in its behalf. This contract of employment was subject to be terminated at the pleasure of the defendant.

On August 6, 1958, H. R. Heaton, representative of the defendant, signed a complaint wherein the plaintiff was charged with the crime of embezzlement in the amount of $282.69, on or about July 12, 1958. At 9 p.m., on the same date, the plaintiff was brought before a justice of the peace and furnished bond in the sum of $1,000 for his appearance before the court on August 14, 1958, at 10 a.m. On August 14, 1958, preliminary

hearing was held and the case was dismissed by the county attorney.

The county attorney of Hall County testified that he dictated the complaint at the request of H. R. Heaton, legal counsel for defendant and representing the defendant; that he had a conference with Heaton, and possibly other officers of the defendant, going over the records which were left by the defendant with him; that he was present at the preliminary hearing; and that he believed Fields and Thompson, for the defendant, might have been present. Hearing was had. Fields testified, and this witness dismissed the action because in his opinion, by the contract between the plaintiff and defendant, he believed the defendant had a civil action against the plaintiff, but not a criminal action against him. The plaintiff was released.

On cross-examination this witness testified that when this matter was brought to his attention the defendant brought certain books for examination; and that at that time, upon the evidence presented by the defendant to him, he believed there was probable cause to believe the plaintiff guilty of the offense charged, and upon this belief the complaint was filed and signed by Heaton.

On redirect examination this witness testified that in all instances wherein a complaint is made to his office and no law enforcement investigation is made, he requires the person making the complaint to sign it; that he had not seen the contract between the plaintiff and the defendant before the preliminary hearing; and that he had the impression that Heaton was making a full and complete disclosure of the defendant's business with the plaintiff, otherwise he would not have filed the complaint.

On recross-examination this witness testified that the evidence taken at the preliminary hearing disclosed a shortage on the part of the plaintiff.

A deputy sheriff served a warrant on the plaintiff at his home, and took him to the county jail. The plaintiff

was kept in a room where he could use the telephone. The plaintiff called two or three people, including his attorney. This witness went home for supper. When he returned the plaintiff and others were still talking, and decided they could make bond. This witness took the plaintiff to the home of the justice of the peace. The bond was signed, and the plaintiff was released. The plaintiff was in custody 2 or 3 hours from the time he was arrested until he was released. On cross-examination this witness testified that the plaintiff was not put in a cell and locked up, but that outside doors of the jail were locked.

The plaintiff testified that he entered into the contract with the defendant and operated the filling station under such contract. Kenneth R. Fields was the supervisor of filling stations and would check the station occasionally, and was supposed to be available for the plaintiff to call if he had difficulty in making his reports. He was required to make a daily report, and had discount slips to fill out and credit cards to make out in duplicate. Up to July 1, 1958, if there was anything determined wrong or short it would show up on the reports which were sent to the office of the defendant and returned to him, and he would receive credit one way or the other, but it seemed that there was always something short. He went to Minnesota about the 28th or 29th of June, and returned July 4th. During his absence no reports were made out. He testified that he tried to figure out what happened while he was gone, to ascertain the amount of gas that was sold, and to make some kind of a report with reference to it; that he tried to call Fields to come out, but Fields was not at home; and that within a day or two Fields did come and talk to him about this matter, but did nothing about it. The plaintiff further testified that he did not recall making any bank deposits during that time; that the next time he saw Fields was when Fields came out to close the filling station and asked him for the keys;

and that he gave Fields the keys to the station. Fields told the plaintiff that he was going to take what money there was in the station and apply it on the records, because the plaintiff was short in his accounts with the defendant. Fields did not count the money, and he never accounted to the plaintiff for the money. When Fields returned, he told the plaintiff that it appeared that the plaintiff was short $152. The plaintiff told Fields that he wanted a complete audit with everything itemized by his own auditor, and Fields told the plaintiff he had better get the money, borrow it if necessary, and if the plaintiff did not get the money he would be arrested. The plaintiff had some money coming for credits and salary, and told Fields that when he was credited with such amounts he would make up the difference in the shortage. Fields contacted the plaintiff two or three times about paying the so-called shortage. The first time the plaintiff knew that he was supposed to be $282.69 short was when he was arrested and that amount appeared in the complaint filed against him.

On cross-examination the plaintiff testified that it was understood by him that all the money he received for the merchandise sold he should deposit in the Overland National Bank in Grand Island, and that he could not use the money for any purpose except to deposit it in the bank; that he sent daily reports to the defendant which showed the amount of fuel on hand and what was sold, a report of the business done each day, the amount of cash on hand, and the amount received; that when he made the deposits, the deposit slips were sent to the defendant; that the contract set forth the amount of commissions he would receive for the sale of various items; that if he knew how much merchandise he sold and what he sold it for it was possible to compute the amount due him, but he did not compute these figures; and that when he started to work under the contract he was furnished with a stock of merchandise consisting of gas and other petroleum products, and $100 in cash.

There were five of the defendant's daily station reports bearing dates of June 30, 1958, July 1, 1958, July 2, 1958, July 3, 1958, and July 7, 8, 9, 10, and 11, 1958, introduced and received in evidence. The June 30th report showed the amount of total receipts $80.23, July 1st, $50.13, July 2nd, $13.20, July 3rd, $18.50, and July 7, 8, 9, 10, and 11, $79.99.

The plaintiff further testified that he made no deposits during the period of time shown by the above reports. When he was absent on the trip to Minnesota, he made no reports to the defendant.

During the plaintiff's absence in Minnesota, a friend of his, and his father who was in charge of a restaurant in connection with the filling station, attended to the operation of the filling station. The plaintiff's friend put up $400 with the idea of going into the fish bait business on the theory that it would help the business at the filling station. This friend helped out at times when he was available from his other work. The money collected during the absence of the plaintiff from the filling station was put in a bag or pouch by the plaintiff's father and delivered to the plaintiff upon his return from Minnesota.

The supervisor of direct accounting for the defendant who was in charge of field auditors testified that the defendant accepts daily reports, checks to ascertain if they are sent in daily, and registers the sales as shown by such reports; that he keeps a register of all field auditors and the auditing he expects these auditors to make from time to time; that he was the principal person under whose direction the field auditor who had charge of the defendant's service station at Grand Island would be working; that he worked in such capacity in June, July, and August 1958; and that Fields was the auditor during that time. He further testified that daily reports would be received from the plaintiff for banking days; that the defendant should receive five reports a week from its stations, and in addition should receive

deposit slips each day. If no deposit slips were received, the matter was taken up immediately. After the records were received in his office they were under his direction and control, and that was the manner in which the filling station operated by the plaintiff was handled during the period the plaintiff was an agent of the defendant up to the time of the audit closing the plaintiff's place of business. He further testified that Fields made an audit of the plaintiff's business on July 7, 1958. At that time Fields called this witness and reported that four of the deposits which were listed on the daily reports furnished by the plaintiff and reported in the audit of July 7th, had never been made in the bank. This witness then did some checking and found that none of these daily reports had been received in his office. He then instructed Fields to make copies of those reports, which Fields did. These reports showed the following receipts of cash for which there were no deposit slips: $80.23, $50.13, $13.20, and $18.50. Another such daily report showed a deposit of $40.03 which, upon checking, was shown not to have been made. This witness then told Fields to make a reaudit of the plaintiff's station and find out what the actual situation was. Fields made a reaudit of the plaintiff's station on July 15, 1959. This reaudit showed a shortage of the petty cash fund of $100, contained a résumé of the gasoline business, and showed a shortage other than the petty cash in the amount of $182.69, a total shortage of $282.69 which was received for merchandise and never deposited in the bank in Grand Island nor accounted for by the plaintiff. This witness made a recapitulation in writing. He verified the fact that the money shown on the plaintiff's daily report had never been deposited in the Overland National Bank in Grand Island. This recapitulation is the instrument that was finally delivered to the county attorney at Grand Island. A final statement of the plaintiff's account shows a balance of $217.26, after all credits due the plaintiff had been taken into account. This wit-

ness was present at Grand Island at the time of the preliminary hearing. An exhibit was prepared by him for the defendant for delivery to the county attorney which disclosed, among other things, a credit to the plaintiff in the amount of $119.49, and constituted a full disclosure of the plaintiff's account and shortage insofar as this witness was able to ascertain.

Kenneth R. Fields testified that he was the zone manager and auditor for the defendant mainly in the area of central and eastern Nebraska; that he lived in Grand Island and was acquainted with the plaintiff only in his official capacity as auditor; that he checked the plaintiff's reports and made audits at the filling station; that he probably saw the plaintiff once a week; that he did not remember the plaintiff discussing with him his difficulties; that the plaintiff, as agent for the defendant, was responsible for any merchandise that was put into the filling station to begin with; that the plaintiff had a starting inventory and if he sold anything contained in the inventory he was required to deposit the money received in the bank; that each time the agent made a report he had to read the meters on the pumps in order to know how many gallons of gasoline or diesel oil had been sold, and the plaintiff was required to make a daily report as to the previous day's readings and deduct from that amount, which would give him the amount of gasoline he was responsible for for that period; that all these matters were transposed on the daily report; and that the daily reports were sent to the defendant at Denver, the agent retaining copies of the daily reports which were always available at the plaintiff's filling station for use in making an audit. He further testified that the inventory was taken from the merchandise at the station, and that was all that was done at the station. This witness further testified that when he took the audit back to the plaintiff the station was closed; that he and the plaintiff went over in detail the items contained in the audit; that he told the plaintiff that the

audit showed a shortage amounting to $282.69; and that as far as the plaintiff was concerned he should pay this amount. The plaintiff said he did not have the money and wanted to use the telephone in the station to make a long distance telephone call to see if he could raise the money. This witness further testified that he did not remember the plaintiff denying the audits made on July 7 and July 15, 1958.

This witness explained that in making an audit he takes the cash on hand that has not been deposited and deposits it in the bank to cover the items shown on the agent's daily report that have been sold; and that the plaintiff never offered or gave any explanation of the shortages shown by the audit. This witness stated that he never at any time told the plaintiff that if he did not pay the shortage he would be arrested and go to jail, and he never threatened the plaintiff nor discussed arrest or jail with him.

Henry R. Heaton, assistant secretary of the defendant, testified that on August 6, 1958, he was in Grand Island on business for the defendant concerning the plaintiff. At that time he had with him an exhibit which was the recapitulation of the plaintiff's account showing the shortage due defendant, and also disclosing credits due the plaintiff in the amount of $119.49. He called on the county attorney, and this exhibit was presented to the county attorney. On cross-examination this witness stated that he went to the office of the county attorney to present the facts in the case as he knew them; and that the matter of filing the complaint was solely up to the discretion of the county attorney.

The principal assignments of error to be determined on this appeal may be stated as follows: The verdict is contrary to the evidence and the law; and the trial court erred in overruling defendant's motion for a judgment notwithstanding the verdict or in the alternative for a new trial.

In 54 C. J. S., Malicious Prosecution, § 26, p. 983, it is

said: "In the majority of decisions probable cause is defined, in substance but with some verbal differences, as reasonable grounds for suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that accused is guilty of the offense with which he is charged." See, also, Tucker v. Cannon, 28 Neb. 196, 44 N. W. 440, adhered to, 32 Neb. 444, 49 N. W. 435; Turner v. O'Brien, 5 Neb. 542.

In 34 Am. Jur., Malicious Prosecution, § 47, p. 731, it is said: "Many definitions of the term 'probable cause,' as used in actions for malicious prosecution, differing more or less in their language, are to be found in the decisions."

In Diers v. Mallon, 46 Neb. 121, 64 N. W. 722, 50 Am. S. R. 598, it is said: "Probable cause is a reasonable ground of suspicion, supported by facts and circumstances of such a nature as to justify a cautious and prudent person in believing that the accused was guilty."

In Bronnenkant v. Kucera, 141 Neb. 408, 3 N. W. 2d 913, the court said: " 'In a malicious prosecution case, the necessary elements for the plaintiff to establish are: * * * (4) the absence of probable cause for such proceeding. * * * If any one of these elements is lacking, the result is fatal to the action.' Kersenbrock v. Security State Bank, 120 Neb. 561, 234 N. W. 419. 'Want of probable cause is an indispensable element of an action for malicious prosecution.' Clausen v. Omaha Loan & Bldg. Ass'n, 131 Neb. 666, 269 N. W. 517.

"This court has held: 'While some of the facts supporting probable cause were disputed by evidence on behalf of plaintiff, yet there were others undisputed upon which the defense of probable cause might be predicated. In such circumstances we have held that the question of probable cause is one of law for the court. "In an action for malicious prosecution where there is sufficient undisputed evidence to show probable cause, the trial court should direct a verdict for the defendant." Bechel v. Pacific Express Co., 65 Neb. 826, 91 N. W. 853,

* * *; McHugh v. Ridgell, 105 Neb. 212, 180 N. W. 75; Kersenbrock v. Security State Bank, 120 Neb. 561, 234 N. W. 419.' Clausen v. Omaha Loan & Bldg. Ass'n, supra. 'It cannot matter that some or many of the facts bearing on the issue as to probable cause are in dispute, if there are still enough established and undisputed to determine the question in point of law.' Bechel v. Pacific Express Co., 65 Neb. 826, 91 N. W. 853. The test as to whether or not there was probable cause is to be determined in the light of facts and circumstances as they existed and were known at the time the prosecution was commenced and not from the viewpoint of subsequently appearing facts. 34 Am. Jur. 731, sec. 47, 784, sec. 140, 790, sec. 153; 38 C. J. 405."

In 54 C. J. S., Malicious Prosecution, § 18, p. 970, it is said: "Want of probable cause for instituting proceedings is an essential and indispensable element of an action for the malicious prosecution of either a civil or a criminal action, no matter what the result thereof; in fact, want of probable cause for the prosecution of the original proceeding by defendant has been described as the gist of the action. The very foundation of the action is that the previous legal proceeding was resorted to or was pursued causelessly.

"Where it appears that there was probable cause to institute the original proceeding, such fact constitutes a complete and absolute defense or bar to an action of malicious prosecution, irrespective of the motive in instituting the prosecution, or of a conspiracy." This is the rule throughout the United States.

To maintain an action of malicious prosecution the plaintiff must prove malice and want of probable cause, notwithstanding the prosecution may be malicious, yet, if there be sufficient probable cause for its institution, the action cannot be sustained. See Turner v. O'Brien, supra.

If a motion for directed verdict made at the close of the evidence in a case should have been sustained for

want of evidence to support a verdict in favor of the party against whom made, it is the duty of the court on motion for judgment notwithstanding the verdict timely made to sustain such motion to set aside the verdict and to render judgment pursuant to the motion for a directed verdict.

The defendant made a motion for directed verdict at the close of the plaintiff's evidence and at the close of all of the evidence.

The evidence of the plaintiff in the instant case fails to show malice or want of probable cause. The evidence adduced by the defendant is more than sufficient to establish a prima facie case of embezzlement on the part of the plaintiff, and therefore shows probable cause to believe him guilty of the crime charged.

The plaintiff failed to maintain his burden of proof by the establishment of malice and want of probable cause. Both are essential elements of the action, and failure of proof of either is fatal to the plaintiff's cause of action.

The defendant made a full disclosure of all information available to it bearing on the innocence or guilt of the plaintiff to the prosecuting attorney, and left the filing of the charge to the discretion of the county attorney.

We conclude that the trial court should have taken the matter from the consideration of the jury and sustained the motion for directed verdict. We reverse the judgment and remand the cause with directions to sustain the defendant's motion for judgment notwithstanding the verdict and to dismiss the plaintiff's cause of action.

REVERSED AND REMANDED WITH DIRECTIONS.

SIMMONS, C. J., participating on briefs.