We briefly note Rick argues on cross-appeal that the district court lacked personal jurisdiction over Ryan and that, so, any rulings as to Ryan were void.[45] All the parties agree on this point, as do we, though it seems to us that the court's observations as to Ryan were simply incidental to determining whether Rick was covered under the policy. But to the extent the court's order makes rulings as to Ryan, such rulings are ineffectual.

## CONCLUSION

We conclude that the severability clause does not affect the unambiguous language of the policies' exclusions, which bar coverage for Rick.

AFFIRMED.

WRIGHT, J., not participating.

---

[45] See, *Johnson v. Johnson*, 282 Neb. 42, 803 N.W.2d 420 (2011); *In re Interest of William G.*, 256 Neb. 788, 592 N.W.2d 499 (1999).

---

CARLA McKINNEY, APPELLANT, v. MATTHIAS I. OKOYE
AND NEBRASKA FORENSIC MEDICAL
SERVICES, P.C., APPELLEES.
___ N.W.2d ___

Filed January 31, 2014.    No. S-13-155.

1. **Summary Judgment: Appeal and Error.** In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.
2. **Actions: Proof.** In a malicious prosecution case, the conjunctive elements for the plaintiff to establish are (1) the commencement or prosecution of the proceeding against the plaintiff, (2) its legal causation by the present defendant, (3) its bona fide termination in favor of the plaintiff, (4) the absence of probable cause for such proceeding, (5) the presence of malice therein, and (6) damages.
3. **Actions: Public Officers and Employees: Liability.** A person who supplies information to prosecuting authorities is not liable for the prosecutors' action so long as any ensuing prosecution is left entirely to the officials' discretion.
4. **Actions: Public Officers and Employees.** A prosecution is not considered the result of the prosecuting authorities' independent discretion if the informant either (1) directs or counsels officials in such a way so as to actively persuade

and induce the officers' decision or (2) knows that the information provided is false or misleading.

5. ____: ____. A person who knowingly provides false or misleading information to a public officer may be liable for malicious prosecution even if that person brought no pressure to bear on the public officer and left the decision to prosecute entirely in the hands of that public officer.

6. **Negligence: Expert Witnesses: Testimony: Intent.** Expert testimony may establish a professional's conduct was so far afield of accepted professional standards or so divergent from the conduct of any minimally competent professional that it is reasonable to infer a knowing or intentional state of mind.

7. **Intent: Proof.** State of mind is difficult to prove, and rarely will the plaintiff be able to provide a "smoking gun."

8. **Summary Judgment: Intent.** Cases where the underlying issue is one of motive or intent are particularly inappropriate for summary judgment.

9. **Actions: Intent: Proof.** Legal causation in a malicious prosecution action is demonstrated when but for the false or misleading information, the decision to prosecute would not have been made.

10. **Probable Cause: Proof.** If there is insufficient undisputed evidence to show probable cause as a matter of law, the question of probable cause is a mixed question of fact and law.

11. **Actions: Probable Cause.** The element of probable cause in a malicious prosecution action is evaluated from the perspective of the defendant in the action who is allegedly legally responsible to the plaintiff for the prosecution, not from the perspective of the nonparty prosecuting officials.

12. **Criminal Law: Probable Cause.** The question of probable cause is whether a person in the defendant's position had reasonable grounds to suspect, based on the facts known or reasonably believed by the defendant at the time, that the crime prosecuted had been committed.

13. **Probable Cause.** Probable cause does not depend upon mere belief, however sincerely entertained; because if that were so, any citizen would be liable to arrest and imprisonment, without redress, whenever any person, prompted by malice, saw fit to swear that he believed the accused was guilty of the offense charged.

14. **Criminal Law: Probable Cause.** No probable cause exists if a defendant knew that the facts stated to prosecuting authorities supporting the suspicions of a crime were false or misleading.

15. **Intent: Words and Phrases.** Malice does not refer to mean or evil intent, as a layman might ordinarily think.

16. **Intent.** The lack of any personal ill will does not necessarily negate the existence of malice.

17. **Actions: Intent: Words and Phrases.** Malice, in the context of a malicious prosecution action, is any purpose other than that of bringing an offender to justice.

18. **Public Officers and Employees: Evidence.** Knowingly providing false or misleading information to prosecuting authorities may support the inference of malice.

Appeal from the District Court for Lancaster County: PAUL D. MERRITT, JR., Judge. Reversed.

George H. Moyer, of Moyer & Moyer, for appellant.

James A. Snowden and Nathan D. Anderson, of Wolfe, Snowden, Hurd, Luers & Ahl, L.L.P., for appellees.

WRIGHT, CONNOLLY, MCCORMACK, and MILLER-LERMAN, JJ., and PIRTLE, Judge.

MCCORMACK, J.

## NATURE OF CASE

A daycare provider brought a malicious prosecution action against the pathologist whose autopsy report was used to charge her with felony child abuse resulting in death. The charge was eventually dropped after two forensic pathologists retained by the daycare provider concluded the cause of death of the infant under her care was sudden infant death syndrome (SIDS). The district court granted summary judgment in favor of the pathologist on the malicious prosecution claim. We must determine whether the inference that the pathologist knowingly provided false or misleading information to law enforcement can reasonably be drawn from expert testimony that the pathologist's autopsy report was false and was "shockingly" unscientific.

## BACKGROUND

Carla McKinney had been providing licensed daycare out of her home for almost 21 years without incident. In 2007, McKinney started caring for a 6-week-old infant boy. Two months later, the infant died in McKinney's care.

### INVESTIGATION OF INFANT'S DEATH

McKinney explained to the police that after feeding the infant, she laid him down for a nap. When McKinney went to wake the infant, he was not breathing. McKinney was unsuccessful in her attempts to revive the infant with cardiopulmonary resuscitation. Although McKinney first told police that the infant remained sleeping on his back until she found

him not breathing, she later explained that she had turned the infant onto his stomach when he had fussed before falling asleep.

Pathologist Dr. Matthias I. Okoye, pursuant to his duties under a contract with Lancaster County, conducted an autopsy on the infant. Okoye's report determined that the cause of death was homicide through blunt force trauma to the head (associated with closed head injury) and asphyxiation. As evidence of blunt force trauma to the head, the report listed two areas of acute subarachnoid hemorrhage, three areas of acute subdural hemorrhage, acute epidural and intraspinal hemorrhage, diffuse acute cerebral edema, a faint contusion on the head, and a recent contusion on the upper lip. Okoye listed 11 distinct clinical findings supporting asphyxia, which we will not list here. The report also listed six "faint red contusions" on the trunk and extremities of the body, as evidence of minor blunt force trauma to the body. In making the autopsy report, Okoye relied on his clinical observations during the autopsy, laboratory tests, reports by the police of McKinney's description of events, and a computed tomography (CT) whole body scan that Okoye had ordered.

During questioning, police investigators told McKinney that the pathologist's provisional report demonstrated the infant had died from a blunt trauma to the head while in her care and that she needed to provide an explanation. The transcription of the police interviews reflects that McKinney eventually said that after lifting the infant from an "Exersaucer" and while in the process of laying him on his side against a "boppy" pillow on the floor, her hand slipped and his head may have hit the floor from a couple inches of height.

## McKinney Charged With
### Felony Child Abuse

McKinney was charged with felony child abuse resulting in death. One of the prosecuting attorneys explained that the Lancaster County Attorney's office did not decide to file the charge based on Okoye's autopsy report alone. She averred that the decision was also based upon the CT scan, McKinney's allegedly inconsistent accounts to the police of events the day

the infant died, and McKinney's perceived admissions during questioning that she caused the infant to hit his head either while being placed on "a 'boppy pillow'" or when she dropped the infant to the floor from waist height after picking him out of "an exercise saucer."

### Charges Are Dropped, and McKinney Sues Appellees

McKinney's counsel agreed to waive the probable cause hearing in exchange for prompt delivery of police reports. The district court issued an "Order of Probable Cause Finding" without a hearing. Approximately 1 year later, the Lancaster County Attorney's office dropped the charges. McKinney alleges that this occurred after pathologists retained by McKinney found that the infant had died of SIDS and that there was no evidence supporting any traumatic injury.

McKinney sued Okoye and his wholly owned corporation, Nebraska Forensic Medical Services, P.C. (collectively appellees), for malicious prosecution stemming from Okoye's autopsy report. After appellees' motion to dismiss based on absolute privilege was unsuccessful,[1] appellees moved for summary judgment.

### Expert Testimony Submitted at Summary Judgment Hearing

At the hearing on appellees' motion for summary judgment, differing expert testimony was presented on the correctness of the autopsy report and the soundness of Okoye's methodology. Okoye generally defended his findings, conclusions, and methods. Appellees' expert witness, a forensic pathologist, also generally defended the autopsy report, except that he found Okoye's diagnosis of asphyxia to be a "diagnosis with no physical evidence offered other than the very non-specific and ubiquitous findings." Forensic pathologists provided by McKinney, Drs. Janice Ophoven and Robert Bux, found the autopsy report "shockingly" baseless in its every detail. Ophoven and Bux opined that the infant died of SIDS.

---

[1] See *McKinney v. Okoye*, 282 Neb. 880, 806 N.W.2d 571 (2011).

Ophoven Deposition

In her deposition, Ophoven addressed Okoye's autopsy report finding by finding. Ophoven had reviewed all the evidence relied on by Okoye, as well as numerous photographs taken by Okoye and law enforcement before, during, and after the autopsy. She stated she was generally "shocked" that Okoye had concluded there was any evidence of traumatic injury. Ophoven stated that much of the supposed evidence of injury had been created by Okoye during the autopsy.

First, Ophoven opined that what Okoye had described as subarachnoid hemorrhages were nothing more than "artifact[s]" created by Okoye during the autopsy process. Ophoven indicated that an artifact is something that is produced by the autopsy technique and, therefore, is not a legitimate autopsy finding. Okoye had circled those areas in two photographs of the brain. Ophoven found Okoye's characterization of those areas as hemorrhaging to be a "significant . . . deviation from good scientific diagnosis."

Ophoven explained that what was demonstrated by one of the photographs was simply "a little bit of blood on the surface of this brain" due to postmortem bleeding after disruptions that are caused when the skullcap is sawed and pulled off during the autopsy. Ophoven explained that with a true hemorrhage, "you see it pooling in the valleys; you see it come up over the hills, and you see it with sufficient — in a typical pattern that would suggest that a pathological process was present, and that is clearly not the case here."

In the other photograph purporting to show subarachnoid hemorrhaging, Ophoven opined, "again, it would be one of those things where you would never conclude that this is hemorrhage." The hemorrhaging was clearly blood vessels that were disrupted in the process of manually pulling the brain out of the head cavity. She stated that the two areas of "hemorrhaging" roughly corresponded to two equidistant areas on either side of the brain where the hands would be placed while extracting it.

Ophoven opined that Okoye had similarly inaccurately characterized three separate locations of "[a]cute subdural hemorrhage." Ophoven noted that photographs showing some

pooling of cerebrospinal fluid were apparently what Okoye was referring to, "since this is the only thing in the head where there's any blood-colored material." Ophoven explained that "this is what you see in every brain when you take [it] out" and that "[w]hen you're messing with the brain, there's an expected amount of cerebrospinal fluid inside the head. And it will pool, along with some of the blood that you're disrupting . . . when you're handling the brain and cutting into the skull." Ophoven stated that she could clearly recognize the fluid as cerebrospinal fluid because of its translucency. Ophoven said, "[I]t's so basic that it is frightening that this was mistaken for subdural blood."

Ophoven opined that the finding of epidural and intraspinal hemorrhaging was likewise baseless. She explained, "[I]t is well-recognized that this is a postmortem artifact that is not considered a legitimate finding. There's lots of literature. . . . And he has misinterpreted this as a pathological finding when, in fact, this is a routine and expected finding in infant autopsies."

The listed "[a]cute subgaleal hemorrhage" was the only area where Ophoven agreed with Okoye that there was "a real piece of blood." Nevertheless, Ophoven explained that the scar tissue and inflammation clearly visible under a microscope indicated it was an old injury. Moreover, the injury was clearly limited to the space between the skull and the scalp; there was no evidence of injury to the brain. Ophoven described the old blood as representing nothing more than a "bump" or something left over from the birthing process.

As for Okoye's listed finding of "[d]iffuse acute cerebral edema," Ophoven testified that the pictures of the brain showed it was "not edematous at all." The "gyri" and "sulci," which Ophoven described as hills and valleys of the brain surface, were normal and well defined. Ophoven explained that with a swollen brain, the valleys are closed and the hills touch each other. She also noted that the CT scan showed no edema.

Ophoven opined that the "[r]ecent focal red abraded contusion" of the "mid upper lip," which was listed by Okoye as evidence of both blunt force trauma to the head and asphyxia,

was "nothing . . . this looks like every baby mouth." Ophoven explained there was no purple contusion, no disruption of the tissue, and no blood. She believed that any color showing in the photograph was a result of Okoye's pulling on the infant's mouth. She stated that in another photograph, the infant's "little lip is just perfectly normal pink there when it's not being pulled up like that."

Ophoven found the remaining listed contusions entirely insignificant. They were not the right pattern, color, or distribution to be indicative of child abuse. She stated that they appeared to be livor mortis. But if they were injuries, they were old injuries. Ophoven stated further that if these areas were of any concern, they should have been examined under a microscope to confirm they were injuries and whether they were fresh. This apparently was not done. Ophoven stated that the "[f]aint red contusion" of the posterior scalp area likewise looked like livor mortis and that no section was taken from it to confirm differently.

Ophoven was "at a loss to understand why asphyxia was added to the list of cause[s] of death." She found all the listed clinical findings in the autopsy report in support of this conclusion to be either autopsy artifact or otherwise unsupportive of asphyxia.

Ophoven was especially perplexed by the conclusion of asphyxia given Okoye's finding of brain edema. Ophoven said that brain edema is fundamentally inconsistent with the pathophysiology of asphyxia. A person who is suffocated, even slowly, does not have time for his or her brain to swell. Ophoven stated that Okoye's inconsistent findings and conclusions were thus "shocking and unscientific" and "not only are there highly irregular findings in this autopsy, the conclusions make no sense."

Ophoven found that Okoye's conclusion of asphyxia was inconsistent with clear evidence that there was "white purge" from the infant's lungs. Ophoven described white purge as the "mechanical antithesis to the idea of suffocation." Ophoven explained that an infant who is suffocated, especially a 4-month-old infant, would struggle and that some blood would

enter the lungs through the nose or mouth. The white purge indicated this did not occur.

In addition to concluding that Okoye's findings and conclusions were baseless, Ophoven generally disapproved of Okoye's methodology. She noted that Okoye handled and sampled the fresh brain before fixing it in formalin. Pictures showed that Okoye had placed the fresh brain on a table, allowing it to deform under its own weight. Okoye took samples for analysis by slicing through the fresh brain, which Ophoven described as a "giant no-no." Cutting into a fresh brain, with its different tissues of varying consistencies, "wrecks it."

Ophoven generally did not consider a CT scan to be a useful tool in diagnosing brain injury. And regardless, she found nothing in the CT scan of the infant indicative of homicide or child abuse. She stated that the radiologist who wrote the CT scan report did not purport to state a cause of death and that the scan found no fractures or evidence of any swelling in the brain. The scan found a "depression of the occipital bone" on the right side, which Ophoven described as "nothing . . . a little divot . . . no big deal." The CT scan also listed a subdural hemorrhage. Ophoven said it was not there and was not confirmed in the autopsy. Ophoven indicated that a pathologist should know how to utilize radiology reports and what weight to put on certain findings. Overall, the CT scan was "a nonhelpful study that turned out to not show anything that was important at the postmortem."

Ophoven summarized that in her 30 years of experience, this was one of the worst autopsy reports she had ever seen. She was "absolutely shocked that these [findings] were described as traumatic injuries." Ophoven said that Okoye's report reflected that "you could then make every [SIDS] case a homicide." In every case of SIDS, if one connected "every dot and every little curlicue and every little artifact and strung it together, [one] could leave the impression to any reasonable person that harm had taken place." And "if I were law enforcement and I [received] a report such as this[, I] would have been forced to investigate this case as a homicide."

BUX AFFIDAVIT

Bux generally agreed with Ophoven's assessment of Okoye's report. Bux stated that Okoye's method of examining the infant's brain by cutting out sections before removing it from the cranial cavity was not practiced by "any other pathologist in the western hemisphere." He explained that it was a bad practice because of "the inherent friability of the infant brain, the tendency to introduce artifact and the inability to obtain good tissue sections for microscopic examination." Bux found Okoye's methodology "bizarre," "shocking, disturbing and perplexing." Bux also explained that "CT scans are notoriously inaccurate in determining head trauma."

Bux concluded that there was "no evidence to support blunt trauma to the head after a careful distinction is made between autopsy artifact and antemortem trauma." Furthermore, the diagnosis of asphyxia appeared to Bux to be something Okoye was "throwing . . . in as a second way to establish a traumatic cause of death if the first cause is rejected by the trier of fact. There is no objective evidence in Dr. Okoye's autopsy report to support this diagnosis."

Bux clarified that his position on Okoye's work was not a "mere difference of professional opinion." To the contrary, he was "embarrassed as a fellow professional at the conduct of Dr. Okoye and the findings he made." Bux concluded: "If Dr. Okoye has the training and experience he claims, he could not make as many errors as he made unless there was some ulterior motive or a reckless disregard for the integrity of the judicial process."

SUMMARY JUDGMENT IN
FAVOR OF APPELLEES

The district court granted summary judgment in favor of appellees, concluding that there was no material issue as to several necessary elements of a malicious prosecution claim.

First, the court concluded that there was no material issue of fact on the required element that Okoye was responsible for the commencement of the prosecution. The court found as a matter of law that "no evidence has been presented from which reasonable minds could conclude that Dr. Okoye knowingly

provided [the county attorney's office] with false or misleading information with the intent to persuade or induce her to file the criminal charge against . . . McKinney."

Second, the court concluded as a matter of law that sufficient probable cause existed to warrant the filing of the charge against McKinney. In reaching this conclusion, the court examined all the information available to the county attorney's office, not just what was known by Okoye. The court did not consider appellees' argument that McKinney's waiver of the preliminary hearing amounted to a prima facie showing of probable cause.

Third, the court found that reasonable minds could not conclude that Okoye acted with malice when he prepared the autopsy reports. Similarly to the court's first finding, the court said that reasonable minds could not conclude that Okoye acted intentionally or with reckless disregard for the consequences.

McKinney appeals the order of summary judgment, which resulted in the dismissal of her malicious prosecution claim.

## ASSIGNMENT OF ERROR

McKinney assigns, summarized, that the district court erred in concluding that there was no material issue of fact pertaining to her malicious prosecution claim.

## STANDARD OF REVIEW

[1] In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.[2]

## ANALYSIS

[2] In a malicious prosecution case, the conjunctive elements for the plaintiff to establish are (1) the commencement or prosecution of the proceeding against the plaintiff, (2) its legal causation by the present defendant, (3) its bona fide termination in favor of the plaintiff, (4) the absence of probable

---

[2] *Guinn v. Murray*, 286 Neb. 584, 837 N.W.2d 805 (2013).

cause for such proceeding, (5) the presence of malice therein, and (6) damages.[3] The parties do not dispute that the county attorney's dismissal of the charges constituted a bona fide termination of the prosecution in favor of McKinney. And they agree there is a material issue of fact on damages. We address whether reasonable minds could differ as to the remaining elements of a malicious prosecution claim. In doing so, we must read the testimony of Ophoven and Bux in the light most favorable to McKinney, and we must give McKinney all reasonable inferences deducible from this evidence.[4]

### Legally Responsible
### for Prosecution

[3,4] We first consider elements (1) and (2): whether Okoye was legally responsible for the commencement of the prosecution against McKinney. The charges against McKinney were initiated by the Lancaster County Attorney's office. A person who supplies information to prosecuting authorities is not liable for the prosecutors' action so long as any ensuing prosecution is left entirely to the officials' discretion.[5] "The exercise of the officer's discretion makes the initiation of the prosecution his [or her] own and protects from liability the person whose information or accusation has led the officer to initiate the proceedings."[6] But, a prosecution is not considered the result of the prosecuting authorities' independent discretion if the informant either (1) directs or counsels officials in such a way so as to actively persuade and induce the officers' decision or (2) knows that the information provided is false or misleading.[7]

---

[3] See, *McKinney v. Okoye, supra* note 1; *Johnson v. First Nat. Bank & Trust Co.*, 207 Neb. 521, 300 N.W.2d 10 (1980).

[4] See *Guinn v. Murray, supra* note 2.

[5] *Schmidt v. Richman Gordman, Inc.*, 191 Neb. 345, 215 N.W.2d 105 (1974). See, also, e.g., Restatement (Second) of Torts § 653, comment *g*. (1977).

[6] Restatement, *supra* note 5 at 409.

[7] See, *Schmidt v. Richman Gordman, Inc., supra* note 5; Restatement, *supra* note 5.

We agree with the district court that there was no issue of fact concerning whether Okoye actively persuaded the county attorney's office to file charges. One of the prosecuting attorneys in the underlying criminal action against McKinney averred: "While I considered Dr. Okoye's report in making my decision to file the Information, Dr. Okoye did not at any time attempt to actively persuade or induce me to pursue prosecution of . . . McKinney." Okoye likewise averred that he did not attempt to persuade law enforcement personnel or the county attorney's office to charge a crime.

Nothing in the record supports a contrary inference. It appears undisputed that the tenor of the communications between Okoye and the county attorney's office was no different than in any other case for which Okoye relayed his autopsy results. We decline McKinney's invitation to expand the meaning of "actively persuade or induce" to encompass the simple knowledge that an autopsy report plays an important role in a county attorney's decision to prosecute.

[5] However, we find the evidence presented at the summary judgment hearing was sufficient to demonstrate a material issue as to whether Okoye knowingly provided false or misleading information in his autopsy report. A person who knowingly provides false or misleading information to a public officer may be liable for malicious prosecution "even if that person brought no pressure to bear on the public officer and left the decision to prosecute entirely in the hands of that public officer."[8]

The governing standard of review for an order of summary judgment should be, and continues to be, one favorable to the nonmoving party,[9] giving that party the benefit of all reasonable inferences deducible from the evidence.[10] Conclusions based upon guess, speculation, or conjecture do not create

---

[8] 52 Am. Jur. 2d *Malicious Prosecution* § 24 at 210 (2011). See, also, e.g., *Bhatia v. Debek*, 287 Conn. 397, 948 A.2d 1009 (2008).

[9] *Controlled Environ. Constr. v. Key Indus. Refrig.*, 266 Neb. 927, 670 N.W.2d 771 (2003).

[10] *Guinn v. Murray, supra* note 2.

material issues of fact for purposes of summary judgment.[11] But where reasonable minds could differ as to whether an inference supporting the ultimate conclusion can be drawn, summary judgment should not be granted.[12] We disagree with appellees' argument that it would be mere speculation and conjecture to conclude, from the most favorable view of the evidence presented at the summary judgment hearing, that Okoye knowingly presented false or misleading information to the county attorney's office.

[6] It may be speculative to infer an intentional or knowing state of mind from nothing more than evidence of simple negligence. But McKinney presented evidence that Okoye acted far afield of mere negligence. Other courts have explained that in a variety of contexts, expert testimony may establish a professional's conduct was "'so far afield of accepted professional standards'" or so divergent from the conduct of any "'minimally competent professional'" that it is reasonable to infer a knowing or intentional state of mind.[13] We agree that when experts find statements by a professional in their field not only false or misleading, but grossly negligent, shocking, and generally inexplicable, then it may be reasonable to infer that the false or misleading statements were knowingly and intentionally made. A reasonable fact finder could infer that Okoye knew or should have known that the statements he made regarding his autopsy and the findings of said autopsy were false or misleading.

Ophoven and Bux testified that every single clinical finding listed by Okoye as supporting his conclusion of homicide was false or misleading, because it either did not exist or did not indicate trauma. Ophoven and Bux described how Okoye "shockingly" misrepresented as multiple traumatic injuries

---

[11] See *Shipley v. Department of Roads*, 283 Neb. 832, 813 N.W.2d 455 (2012).

[12] *Farmington Woods Homeowners Assn. v. Wolf*, 284 Neb. 280, 817 N.W.2d 758 (2012).

[13] *Jimenez v. City of Chicago*, 732 F.3d 710, 722 (7th Cir. 2013). See, also, e.g., *Norfleet v. Webster*, 439 F.3d 392 (7th Cir. 2006); *Collignon v. Milwaukee County*, 163 F.3d 982 (7th Cir. 1998).

what were only "artifacts" that Okoye himself had created during the autopsy process. Ophoven and Bux were generally at a loss to explain how a trained pathologist could conclude that even one of these listed findings was evidence of traumatic injury. Ophoven and Bux described shocking and bizarre methodology.

The confluence of false or misleading findings and conclusions, each so far afield from the findings and conclusions of any minimally competent pathologist, could lead to a reasonable inference that they were more than mistakes and incompetence. The evidence of reckless disregard for established pathology procedures could lead to the inference that Okoye was unconcerned with establishing a truthful report. Viewing the evidence in a light most favorable to McKinney as the nonmoving party, we determine reasonable minds could differ as to whether Okoye knew that the findings and conclusions stated in the autopsy report were false or misleading.

[7,8] State of mind is difficult to prove, and rarely will the plaintiff be able to provide a "'smoking gun.'"[14] Thus, we have explained that cases where the underlying issue is one of motive or intent are particularly inappropriate for summary judgment.[15] The district court erred in determining Okoye's intent as a matter of law.

Appellees argue that even if there is a material issue of fact whether Okoye knowingly provided false or misleading information, he did not cause the prosecution. Appellees point out statements made by one of the prosecuting attorneys that she "did not rely on Dr. Okoye's autopsy report alone in making [her] decision to prosecute . . . McKinney."

[9] Such statements do not create even a prima facie case for summary judgment on the element of legal causation by the defendant. Legal causation is demonstrated when but for

---

[14] See, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007); *U.S. v. Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010); *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770 (3d Cir. 2007); *Com. of Pa. v. Flaherty*, 983 F.2d 1267 (3d Cir. 1993); *Neiman v. Tri R Angus*, 274 Neb. 252, 739 N.W.2d 182 (2007).

[15] *Schatz v. Vidlak*, 229 Neb. 4, 424 N.W.2d 613 (1988).

the false or misleading information, the decision to prosecute would not have been made.[16] If the decision to prosecute would have been made with or without the false or misleading information, the defendant did not cause the prosecution by supplying false or misleading information.[17]

Although one of the prosecuting attorneys listed other considerations upon which she based her decision to prosecute, she did not state whether she would have prosecuted McKinney with or without Okoye's autopsy report. And regardless, a "'plaintiff is not required to present direct evidence such as testimony from a prosecutor to establish causation in a malicious prosecution claim.'"[18]

Proximate causation is generally a question for the jury, and only where but one inference can be drawn is it proper for the court to decide the issue.[19] Viewing the evidence at the summary judgment hearing in a light most favorable to McKinney, we determine reasonable minds could conclude that Okoye's false report legally caused the prosecution. We find appellees' argument to the contrary to be without merit.

## PROBABLE CAUSE

[10] We turn next to the element of probable cause. In an action for malicious prosecution, probable cause is a question of law for the court to determine where there is sufficient undisputed evidence to show probable cause.[20] However, it is for the jury to determine what facts are proved.[21] Thus, if there

---

[16] See, *Matthews v BCBSM*, 456 Mich. 365, 572 N.W.2d 603 (1998); *Waldner v. Dow*, 128 Or. App. 197, 876 P.2d 785 (1994); *Danielson v. Hess*, 807 N.W.2d 113 (S.D. 2011); *Browning-Ferris Industries, Inc. v. Lieck*, 881 S.W.2d 288 (Tex. 1994); 52 Am. Jur. 2d, *supra* note 8.

[17] See, *Matthews v BCBSM, supra* note 16; *Danielson v. Hess, supra* note 16; *King v. Graham*, 126 S.W.3d 75 (Tex. 2003).

[18] *French v. French*, 385 S.W.3d 61, 71 (Tex. App. 2012).

[19] *Maloney v. Kaminski*, 220 Neb. 55, 368 N.W.2d 447 (1985).

[20] See, e.g., *Brumbaugh v. Frontier Refining Co.*, 173 Neb. 375, 113 N.W.2d 497 (1962); Restatement, *supra* note 5, § 673.

[21] *Turner v. O'Brien*, 5 Neb. 542, 1877 WL 4241 (1877).

is insufficient undisputed evidence to show probable cause as a matter of law, the question of probable cause is a mixed question of fact and law.[22]

[11] The district court erred by evaluating the element of probable cause from the perspective of the nonparty prosecuting authorities. The element of probable cause in a malicious prosecution action is evaluated from the perspective of the defendant in the action who is allegedly legally responsible to the plaintiff for the prosecution, not from the perspective of the nonparty prosecuting officials.[23] Thus, we have said that whether probable cause exists depends, not upon the actual facts of the case, but upon the question of whether the person making the claim had reasonable grounds to believe in its truth.[24] The person who knowingly provided false or misleading information becomes the "real prosecutor."[25]

[12,13] The question of probable cause is whether a person in the defendant's position had reasonable grounds to suspect, based on the facts known or reasonably believed by the defendant at the time, that the crime prosecuted had been committed.[26] "Probable cause does not depend upon mere belief, however sincerely entertained. Because if that were so, any citizen would be liable to arrest and imprisonment without redress, whenever any person, prompted by malice,

---

[22] See *Giannamore v. Shevchuk*, 108 Conn. App. 303, 947 A.2d 1012 (2008).

[23] See, e.g., *Johnson v. First Nat. Bank & Trust Co.*, supra note 3; *Rose v. Reinhart*, 194 Neb. 478, 233 N.W.2d 302 (1975); *Cimino v. Rosen*, 193 Neb. 162, 225 N.W.2d 567 (1975); *Schmidt v. Richman Gordman, Inc.*, supra note 5; *Brumbaugh v. Frontier Refining Co.*, supra note 20; *Brewer v. Fischer*, 144 Neb. 712, 14 N.W.2d 315 (1944); *Kersenbrock v. Security State Bank*, 120 Neb. 561, 234 N.W. 419 (1931); *Turner v. O'Brien, supra* note 21. See, also, e.g., *Tomaskevitch v. Specialty Records Corp.*, 717 A.2d 30 (Pa. Commw. 1998).

[24] See *Turner v. O'Brien, supra* note 21.

[25] *Holmes v. Crossroads Joint Venture*, 262 Neb. 98, 117, 629 N.W.2d 511, 527 (2001).

[26] See, *Cimino v. Rosen, supra* note 23; *Jones v. Brockman*, 190 Neb. 15, 205 N.W.2d 657 (1973); *Brumbaugh v. Frontier Refining Co.*, supra note 20; Restatement, *supra* note 5, § 662.

saw fit to swear that he believed the accused was guilty of the offense charged."[27]

[14] Ophoven and Bux both opined that there was no reasonable basis for a pathologist in Okoye's position to believe that the cause of death was homicide. We have already discussed that there is a material issue of whether Okoye knowingly provided false or misleading information in his autopsy report. No probable cause exists if a defendant knew that the facts stated to prosecuting authorities supporting the suspicions of a crime were false or misleading.[28] Under such circumstances, the defendant's belief that the plaintiff committed a crime is not reasonable.[29] Insofar as there is conflicting expert testimony concerning what someone in Okoye's position would have reasonably believed and whether Okoye knew that the facts stated in his autopsy report were false or misleading, there is a dispute of fact on the element of probable cause precluding determination of this issue as a matter of law.

We find no merit to appellees' argument that McKinney's waiver of her preliminary hearing in the underlying criminal case established a prima facie case of probable cause as a matter of law. Leaving aside whether such a prima facie case could otherwise be made when the preliminary hearing was not actually conducted, there can be no prima facie case of probable cause if false or misleading statements or omissions were material to that finding.[30] Furthermore, even if such a prima facie case had been made, there is a material issue of fact that it was rebutted.

The district court erred in concluding that appellees had demonstrated there was no material issue of fact on the element of probable cause.

---

[27] *Ross v. Langworthy*, 13 Neb. 492, 495, 14 N.W. 515, 517 (1882).

[28] See, e.g., *Horne v. J.H. Harvey Co.*, 274 Ga. App. 444, 617 S.E.2d 648 (2005).

[29] See *id*.

[30] See, *Hinchman v. Moore*, 312 F.3d 198 (6th Cir. 2002); *Darrah v. City of Oak Park*, 255 F.3d 301 (6th Cir. 2001); *Lay v. Pettengill*, 191 Vt. 141, 38 A.3d 1139 (2011).

## Malice

[15-17] We turn lastly to the element of malice. Malice does not refer to mean or evil intent, as a layman might ordinarily think.[31] Thus, the lack of any personal ill will does not necessarily negate the existence of malice.[32] Malice, in the context of a malicious prosecution action, is any purpose other than that of bringing an offender to justice.[33]

[18] Malice may be deduced from the surrounding facts and circumstances.[34] It may be inferred from the absence of probable cause, although malice and probable cause are not synonymous.[35] Wanton and reckless disregard for the rights of others may imply malice.[36] Knowingly providing false or misleading information to prosecuting authorities may support the inference of malice.[37]

Whether Okoye acted with malice is a question upon which reasonable minds could differ—in the same way reasonable minds could differ, based on the conflicting expert testimony, as to whether the autopsy report was false or misleading at all. As a procedural equivalent to a trial, a summary judgment is an extreme remedy.[38] And, like intent, malice is almost always a question for the trier of fact.[39] The district court erred in determining the element of malice as a matter of law.

## CONCLUSION

Appellees failed to demonstrate they are entitled to summary judgment. Most important, differing reasonable inferences

---

[31] *Strong v. Nicholson*, 580 So. 2d 1288 (Miss. 1991).

[32] 7 Am. Jur. Proof of Facts 2d 181 *Malicious Prosecution* § 11 (1975).

[33] See, *McKinney v. Okoye, supra* note 1; Restatement, *supra* note 5, § 668.

[34] See *Schmidt v. Richman Gordman, Inc., supra* note 5.

[35] See *id.*

[36] *Johnson v. First Nat. Bank & Trust Co., supra* note 3.

[37] See, *Sanders v. English*, 950 F.2d 1152 (5th Cir. 1992); *Horne v. J.H. Harvey Co., supra* note 28; *Jenkins v. Baldwin*, 801 So. 2d 485 (La. App. 2001).

[38] See *Green v. Box Butte General Hosp.*, 284 Neb. 243, 818 N.W.2d 589 (2012).

[39] See 7 Am. Jur. Proof of Facts 2d, *supra* note 32.

could be drawn as to whether Okoye knowingly provided false or misleading information in his autopsy report. Because the elements of a malicious prosecution action are difficult to prove, "a plaintiff has a steep climb in prosecuting a malicious prosecution action."[40] Nevertheless, appellees have not demonstrated as a matter of law that McKinney will not make that climb.

We reverse the district court's order granting appellees summary judgment.

REVERSED.

HEAVICAN, C.J., and STEPHAN and CASSEL, JJ., not participating.

---

[40] *McKinney v. Okoye, supra* note 1, 282 Neb. at 887, 806 N.W.2d at 578.

---

STATE OF NEBRASKA, APPELLEE, V.
CODY M. BRUCKNER, APPELLANT.
___ N.W.2d ___

Filed January 31, 2014.    No. S-13-164.

1. **Collateral Estoppel: Appeal and Error.** The applicability of the doctrine of collateral estoppel constitutes a question of law. With regard to such a question, an appellate court is obligated to reach a conclusion independent from the lower court's conclusion.

2. **Collateral Estoppel: Words and Phrases.** "Collateral estoppel" means that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties or their privies in any future lawsuit.

3. **Collateral Estoppel.** There are four conditions that must exist for the doctrine of collateral estoppel to apply: (1) The identical issue was decided in a prior action, (2) there was a judgment on the merits which was final, (3) the party against whom the rule is applied was a party or in privy with a party to the prior action, and (4) there was an opportunity to fully and fairly litigate the issue in the prior action.

4. **Constitutional Law: Collateral Estoppel: Double Jeopardy.** The doctrine of collateral estoppel is embodied in the 5th Amendment guarantee against double jeopardy and is applicable to the states through the 14th Amendment.

5. **Collateral Estoppel: Double Jeopardy.** The fact that collateral estoppel is embodied in double jeopardy does not mean that it is coextensive with the protections of double jeopardy.